BELA SEATING COMPANY, Inc., Plaintiff,

v.

POLORON PRODUCTS, INC., Defendant.

Civ. A. No. 65 C 1702.

United States District Court
N. D. Illinois, E. D.
Dec. 23, 1968.

Dressler, Goldsmith, Clement & Gordon, Chicago, Ill., for plaintiff.

Bair, Freeman & Molinare, Chicago, Ill., for defendant.

AUSTIN, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
### FINDINGS OF FACT
#### THE PARTIES

1. Plaintiff, Bela Seating Company, Inc. (Bela Seating), is an Illinois corporation having a place of business at 9505 South Prairie Avenue, Chicago, Illinois. Plaintiff is the successor-in-interest of J & J Tool & Machine Company, a sole proprietorship owned by Bela B. Junkunc. For purposes of convenience, both Bela Seating and J & J Tool & Machine Company are referred to in these Findings of Fact as "plaintiff."

2. Defendant, Poloron Products, Inc. (Poloron), is a New York corporation. Defendant has admitted that it has a regular and established place of business

at 600 South Michigan Avenue, Chicago, Illinois. Acts of infringement, including sales of the accused chairs, have been committed in Chicago and elsewhere.

### THE ISSUES

3. This suit was filed by plaintiff on October 13, 1965, for infringement of United States Letters Patent No. 2,954,-073, entitled "Folding Tablet Arm Chair," issued on September 27, 1960 in the name of Bela B. Junkunc. On January 1, 1965, the entire right, title and interest in and to the patent in suit (hereinafter sometimes called the Junkunc patent) was assigned to Bela Seating.

4. The case was tried on the issues presented by the Amended Complaint and the Amended Answer and Counterclaim. Defendant was charged with infringing claims 1 through 7, 10, 12, 14 and 15 of the Junkunc patent. Defendant denied validity and infringement and counterclaimed against plaintiff, charging violation of the antitrust laws.

5. Prior to trial, defendant moved for summary judgment on the ground that plaintiff had allegedly misused its patent by refusing to grant to defendant a license on the identical terms and conditions as are contained in a license previously granted to another company, Hampden Specialty Products Corp. Defendant's motion was denied.

6. The trial was extensive and thorough, continuing for a period of ten days in court. The record of testimony and argument is almost 2,000 pages in length. These Findings of Fact represent a thorough study of the evidence and are based on the most credible evidence.

### THE SUBJECT MATTER OF THE PATENT IN SUIT

#### *The Disclosure*

7. The Junkunc patent concerns a "Y-frame" folding chair which has a tablet arm that is supported in its position of use by an elogated link pivotally connected at one end to the chair seat and connected at its other end to the underside of the tablet arm by means that (a) permit pivotal movement of the tablet arm with respect to the link about two perpendicular axes, and (b) also permit sliding movement of the tablet arm along the link. The actual invention disclosed in the patent in suit is not limited to such means in the form either of a true universal joint or the equivalent thereof, nor is it limited to use of a slidable sleeve of any type in such means. Nothing in the prior art requires any such limitation.

8. The tablet arm disclosed in the Junkunc patent moves from a lowermost out-of-the-way position (illustrated in Figure 3 of the patent) to a writing position (illustrated in Figures 1, 2 and 17 of the patent), and vice versa, independently of the chair seat while the chair seat is in its open, unfolded position.

9. The tablet arm disclosed in plaintiff's patent also opens to its writing position cooperatively with the chair seat when the chair is unfolded into its open position from its fully closed position (illustrated in Figures 6 and 16 of the patent).

10. The tablet arm disclosed in plaintiff's patent also moves down from its writing position to a fully closed position cooperatively with the chair seat when the chair seat is folded into its fully closed position from its open, writing position.

#### *Differences Between Y-Frame and X-Frame Chairs*

11. Chairs of the "Y-frame" type are completely different in structure and operation from chairs of the "X-frame" type. A "Y-frame" folding chair is a folding chair in which the front frame and the back legs of the chair form an inverted Y-shaped structure, and if the chair is a folding tablet arm chair, the tablet arm supporting link is pivotally connected at its lower end to the chair seat, as is required by the claims of the Junkunc patent. In contrast, in the conventional "X-frame" folding chair, the

front and rear legs cross to form an X-shape, and, if the chair is a folding tablet arm chair, the tablet arm supporting link is pivotally connected at its lower end to the front frame of the chair.

2. A Y-frame chair is usually formed of tubular steel, while an X-frame chair is usually formed of channel steel. This is so because if an X-frame chair were made of tubular steel, the frame would become very bulky by reason of the additional width required to allow for the scissors action of the front legs against the rear legs. On the other hand, the Y-frame chair is very well suited for the desirable tubular steel construction because it does not have the scissors action of the legs.

13. The difference between tubular steel and channel steel construction is extremely important. There is testimony by witnesses for both parties as to the superiority of the tubular steel construction as compared with the channel steel construction.

14. Other advantages of the Y-frame chair over the conventional X-frame chair are that a Y-frame chair is usually easier to open than an X-frame chair, a Y-frame chair has superior strength and rigidity over the X-frame chair, and a Y-frame chair is considerably more stable and safer than an X-frame chair.

*The Invention Was of Great Significance to the Chair Industry*

15. Despite the fact that chairs with Y-frame construction have many advantages over X-frame chairs, prior to the invention of the patent in suit there was no Y-frame folding chair with a tablet arm that could be moved both cooperatively and independently with respect to the seat. The Junkunc invention gave to the industry and to the public for the first time a Y-frame folding tablet arm chair with both cooperative and independent movement of the tablet arm with respect to the folding and unfolding of the chair seat.

16. The patented chair is very useful in institutions such as schools, churches, clubs, cafeterias, hotels, business establishments, colleges, universities and the like.

17. It is very important for institutional use to have folding tablet arm chairs that can be stored in a relatively small amount of space. With the patented chair, the seat, legs and tablet arm can be folded to provide a compact unit. The folded chairs can thus be stacked and stored in a small space whenever desired.

18. It is also important in institutional use that folding tablet arm chairs be opened and closed quickly so that they can be set up and subsequently removed in a very short time. With the patented chair, there is cooperative movement of the tablet arm with the chair seat, making possible rapid setting up or rapid folding, and in preferred embodiments both rapid setting up and rapid folding.

19. To open the patented chair, one needs merely to lift up on the tablet arm and as the arm swings up, the seat and legs unfold cooperatively with the tablet arm. The chair may be folded automatically from its fully opened position by merely putting one foot on the conventional bottom cross brace at the rear of the chair and pulling up on the backrest of the chair. Another method of rapidly folding the chair while the tablet arm is in its writing position is to grasp the seat and pull up on it to fold it.

20. In institutional use, it is also very advantageous to have a tablet arm that can be swung out of the user's way, while the chair seat remains in its open position. Such independent movement of the tablet arm permits closer spacing of rows of chairs and also enables one to sit down on the chair and get up from the chair with ease. The independent movement of the tablet arm with respect to the chair seat is extremely useful for specialized activities, such as in music classes, in which the tablet arm is used only part of the time.

21. The Junkunc invention was of great significance to the chair industry. None of the many chairs of the prior art had all the advantages of the patented

chair which are specified in Findings of Fact 12 through 20 above.

### Courtroom Demonstrations of Plaintiff's Chairs

22. The very chair from which Figures 1 through 16 of the drawings of the patent in suit were prepared was operated in courtroom demonstrations. These demonstrations established that that chair was indeed one of the chairs disclosed in the patent in suit, and that the claims in issue in this lawsuit read upon that chair.

23. Plaintiff's present commercial chair, which is covered by the claims in issue in this lawsuit, was also operated in courtroom demonstrations. Plaintiff's commercial chair is substantially the same as the particular chair from which Figures 1 through 16 of the drawings of the patent in suit were prepared, the main difference being that in the chair sold commercially today the tablet arm is designed to drop to a still lower out-of-the-way position at the side of the chair than is shown in Figure 3 of the patent. This difference is not reflected in the claims of the patent in suit.

24. During preparation for the trial of this lawsuit, one of plaintiff's employees was instructed to make the chair shown in Figures 17–21 of the Junkunc patent, and he did construct a chair that conformed to those drawings. Courtroom demonstrations of that chair clearly established its operability and usefulness, and that the claims in issue in this lawsuit read upon that chair.

### INFRINGEMENT BY DEFENDANT

#### Meaning of the Claims

25. None of the act of the applicant or his attorney during the prosecution of the patent application which matured into the patent in suit in any way restricted the normal and ordinary meaning of the language of the claims in issue. All of the claims in issue were allowed by the Patent Office in the condition in which they were originally filed, and are entitled to a scope covering their literal meaning and a full range of equivalents.

26. Both of the parties to this lawsuit presented expert witnesses. Plaintiff's technical expert, Alexander Cowie, is a professor in the Department of Mechanical and Aerospace Engineering of the Illinois Institute of Technology, and specializes in the field of kinematics, which is the study of the movement of bodies without regard to the forces applied to them. Defendant's expert witness, Charles Pigott Jr., is a patent attorney who practices in the city of Chicago and has a background in mechanical engineering.

27. Professor Cowie described in ordinary mechanical or technical terms the various structural and operational features of defendant's accused chair. These terms were for the most part the terms employed in the claims in issue in the present lawsuit.

28. Much trial time was taken up by defendant's patent expert in an attempt to construe the words of the claims in issue as encompassing something different from that present in defendant's accused chair. Much of Mr. Pigott's testimony served only to make a relatively simple folding chair appear like an unduly complex mechanism, notwithstanding the relatively simple language of the claims in issue.

### Claims in Issue Cover Accused Chair

29. Most of the terms employed in the claims in issue in this lawsuit are ordinary mechanical terms that in the context of the claims in which they are found have a clear, accepted and usual meaning.

30. The meaning of the term "relative sliding movement" between the tablet arm and the supporting link is clear beyond any question in the light of the entire specification and the drawings of the patent in suit. The term "universal joint," found in certain of the claims in issue, is a technical term the accepted meaning of which is shown by the testi-

mony of the expert witnesses of both plaintiff and defendant and the publications relating to the term which are in evidence. The term "universal pivotal movement" is directly defined, and the term "maintain * * * in position" is indirectly defined, in the specification of the patent in suit.

31. Even without the aid of the expert testimony of Professor Cowie, the Court was able to identify very nearly all of the elements of claims 1 through 7, 10, 12, 14 and 15, which are the claims in issue in this lawsuit, in the specimens of defendant's accused chair which were introduced in evidence by both plaintiff and defendant. Professor Cowie's testimony made it clear that the relatively few features of the claims in issue which were not easily observable and identifiable by the Court were also present in defendant's accused chair.

32. Every structural and functional detail specified in claims 1–6 and 14 of the patent in suit is precisely copied and utilized in defendant's chair.

33. With respect to claims 7, 10, 12 and 15 of the patent in suit, each of these claims has one detail (the universal joint) which is not copied exactly by defendant, but as to that detail defendant's accused structure is mechanically equivalent.

34. Specimens of the accused chair were demonstrated and operated during the trial. It was clear that all of the operational characteristics of the patented chair that are described above in Findings of Fact 17–20 are present in the accused chair.

*Movement "Simultaneously As A Cooperative Assembly"*

35. Claims 1 and 2 of the patent in suit require, among other things, movement of the tablet arm and chair seat to different positions "simultaneously as a cooperative assembly." Such cooperative movement is present, and the expert witnesses of plaintiff and defendant both testified to this effect, during closing of defendant's accused chair. Although defendant's patent expert testified that claims 1 and 2 of the patent in suit, as well as the claims with similar language, require that the tablet arm be raised from its completely closed position by merely manipulating the chair seat to thereby automatically raise the tablet arm, such a construction is erroneous because it is a departure from the unambiguous literal meaning of the language of the claims, and is nowhere required by the language of the specification of the patent in suit or by the prior art.

36. Courtroom demonstrations of the chair from which Figures 1 to 16 of the patent in suit were prepared, and the chair which was made by following Figures 17 through 21 of the patent in suit, show that the chairs disclosed in the patent cannot be opened from their completely closed position by merely manipulating the chair seat to thereby automatically raise the tablet arm, as defendant's patent expert testified. Both Professor Cowie and Mr. Junkunc recognized from the disclosure of the patent in suit that the chairs there shown could not be opened from their completely closed position by merely pushing forward on the chair seat. That such operation is impossible would be clear to anyone skilled in the art, simply by referring to Figure 5 of the patent in suit. Figure 5 shows beyond question that manipulation of the seat alone will not cause the tablet arm to rise when it is in its completely closed position, because in that position the pivot between the top end of the link and the tablet arm is located behind the centerline which passes through (a) the axis about which the rear of the tablet arm pivots and (b) the axis about which the bottom of the link pivots, when the arm is raised.

37. In any event, movement of the tablet arm and chair seat to different positions "simultaneously as a cooperative assembly" is present, and the expert witnesses of plaintiff and defendant both testified to this effect, when defendant's accused chair is opened by pulling up on the outer edge of the tablet arm.

### Movement of the Tablet Arm "With" the Chair

38. Claims 3 and 6 call for movement of the tablet arm "with" the chair. This is a common English term. Simple observation shows that during closing of defendant's accused chair, there is movement of the tablet arm "with" the chair. Defendant's expert witness testified to the same effect.

39. The language of claims 3 and 6 does not require that the tablet arm move with the chair seat during both closing and opening of the chair, nor is there anything in the specification to require this result.

### "Universal Pivotal Movement"

40. Claims 4 and 5 fall for "universal pivotal movement" of the tablet arm with respect to the link. This term has no established or common meaning. "Universal movement" is defined in column one of the patent, lines 65–68, as "movement about different axes at the same time or at different times." Claims 4 and 5 are original claims of the application as filed, and call for "substantially universal pivotal movement of said arm with respect to said link." The specification and claims thus together define the term "universal pivotal movement." The term includes movement of the tablet arm in the specified manner with respect to the link, as well as movement of the parts of the joint structure with respect to one another.

41. Defendant's accused chair has universal pivotal movement of the tablet arm with respect to the link within the meaning of claims 4 and 5 of the patent in suit.

### "Sliding Movement"

42. Claim 5 calls for "relative sliding movement" between the arm and the link "in selected positions of said arm with respect to said chair." A similar limitation in claim 14 reads "permitting sliding movement axially of said link."

43. The only reasonable construction of these phrases in claims 5 and 14, in the light of the general disclosure of the specification and drawings of the patent in suit, is to describe the downward and upward sliding of the tablet arm with respect to the link as the arm moves between its uppermost and lowermost out-of-the-way positions.

44. Defendant's accused chair exhibits the sliding movement between the tablet arm and the link that is called for by claims 5 and 14 of the patent in suit.

### "Support" and "Maintain"

45. Claims 6 and 14 of the patent in suit recite two different pairs of elements—the joint structure and the link in claim 6, the joint structure and the rear pivotal connection in claim 14—which cooperate to support the tablet arm and maintain it in position when the arm is disposed in a position of use and the chair is in an open position. Claims 7 and 10, being dependent from claim 6, are similar to claim 6 with respect to this limitation.

46. There can be no doubt that the front joint structure "supports" the tablet arm of defendant's accused chair. This was testified to by the expert witnesses of both plaintiff and defendant, and can be observed as well.

47. In order to "maintain" the tablet arm of a folding tablet arm chair in position, it is not necessary to have a positive lock against downward pressure on the outer edge portion of the tablet arm, as with the chair illustrated in Figures 1 to 16 of the patent in suit. There is no showing in the patent in suit of an apparatus in which the front and rear pivotal connections of the tablet arm cooperate to lock the arm against downward pressure on the outer edge portion of the tablet arm. Nor is a lock of any kind provided against downward pressure on the outer edge portion of the tablet arm in the embodiment of Figures 17 to 21 of the patent in suit.

48. The specification and claims of the patent in suit show that as the terms are used in the claims, "support" means support against gravity, and "maintain"

means to maintain the tablet arm in writing position against downward (writing) pressure on the inner edge portion of the tablet arm.

49. The joint structure and the link of defendant's accused chair are cooperatively arranged to maintain the tablet arm in position when said arm is disposed in a position of use and said chair is in an open position. So also are the joint structure and the rear pivotal connection of the accused chair.

### "Universal Joint"

50. Claims 7, 10, 12 and 15 of the patent in suit call for a "universal joint." In a true "universal joint," (a) there are two perpendicular pivot axes, (b) there are two intersecting non-colinear axes of rotation, and (c) each axis of rotation intersects at least one pivot axis. A true "universal joint" has three functions: (a) to transmit rotary motion between said non-colinear axes, (b) to permit "compound pivotal movement," i. e., movement about two perpendicular axes at the same time, and (c) to permit movement about two perpendicular pivot axes at different times.

51. The joint structure at the front of the tablet arm in defendant's accused chair is the mechanical equivalent of a true universal joint. When the tablet arm of defendant's accused chair is forced by the chair seat from its fully closed position to its lowermost out-of-the-way position by the opening of the chair seat, the tablet pivots with respect to the link about two perpendicular axes at the same time. In other words, defendant's joint structure provides compound pivotal movement of the tablet arm with respect to the link, which is a function of a true universal joint. Additionally, like a true universal joint, defendant's joint structure has two perpendicular pivot axes. Hence, the arm can pivot with respect to the link about a pivot axis perpendicular to the plane of the tablet arm and can pivot with respect to the link about the fore-and-aft axis of the tablet arm at a different time. In providing the described pivoting actions at the same time and at different times, defendant's joint structure performs the same function in substantially the same way and with the same results as would a true universal joint.

52. Defendant has made certain unimportant variations in order to avoid having a true universal joint, but its joint structure performs the same function in substantially the same way to obtain the same results as a true universal joint, and is therefore equivalent thereto.

### "Means for Holding Said Link Against Sliding Movement"

53. Claim 15 calls for "means for holding said link against sliding movement." This language is clear and unambiguous.

54. The only reasonable construction of this phrase in claim 15, in the light of the remainder of the claim and the general disclosure of the specification of the patent in suit, is to include in this phrase any means for holding the tablet arm against sliding movement in a downward direction along the link from an uppermost position, and any means to hold the tablet arm from sliding off the outermost end of the link when the tablet reaches that point in its sliding movement in an upward direction along the link.

55. As such means for holding the link against sliding movement, defendant's accused chair has (a) the detent between the link and sleeve that, when engaged, holds the tablet arm in its uppermost out-of-the-way position, (b) the flange on the link abutting the plastic plug at the top of the link, and (c) the plastic plug at the top of the link which is held against the underside of the tablet arm by the joint structure when the tablet arm is in its writing position.

### "Automatic" Movement

56. Claim 15 requires that the "tablet arm is moved automatically by the pivotal movement of said seat relative to said front frame." Since the claim does not

require that the automatic movement called for be present during both closing and opening of the chair, this limitation is met by movement of the type described during either closing or opening of the chair.

57. The courtroom demonstrations of defendant's accused chair made it clear, and defendant's patent expert agreed, that there is automatic movement of the tablet arm when the chair is normally closed by putting one foot on the brace across the rear legs and pulling up with one hand on the top of the back of the chair. There is also automatic movement of the tablet arm when the chair is closed by lifting up on the seat of the chair. In both methods of closing the chair, as the seat pivots with respect to the front frame, the tablet arm will move "automatically" to its folded position.

58. The Court observed in demonstrations of defendant's accused chair during the trial, and defendant's patent expert conceded upon cross examination, that there is "automatic" movement between the tablet arm and chair seat during opening of defendant's accused chair by pulling up on the tablet arm so that the tablet arm moves into its writing position and the chair seat goes into its position of use.

### THE PRIOR ART

59. In its answering brief, defendant relies on eight patents in an attempt to show that the patent in suit is invalid as being either "anticipated within the meaning of 35 U.S.C. Sec. 102" or "obvious and lacking the conditions for patentability within the meaning of 35 U.S.C. Sec. 103." These eight patents are Watkins No. 1,196,050, Moore No. 1,864,-750, Hamilton No. 1,905,859, Clarin No. 2,664,943, Clarin No. 2,675,062, Supita No. 2,676,645, Adler No. 2,719,574 and Eves et al. No. 3,024,065.

60. Of the eight patents on which the defendant relies, five were considered by the Patent Office Examiner during the prosecution of the application which matured into the patent in suit. These were the Watkins, Moore, Clarin '943, Clarin '062 and Supita patents. The Examiner held the claims to be allowable notwithstanding those five patents. The fact that certain prior art patents were not applied by the Examiner against the claims but were only cited in the file history shows that the Examiner did not consider such patents to be as pertinent as those that he did apply against the claims.

61. The three patents relied upon by defendants at the trial which were not before the Examiner—the Hamilton, Adler and Eves et al. patents—are no more pertinent than the patents which were considered by the Patent Office, and add nothing to the disclosure of those patents.

### Moore Patent No. 1,864,750

62. Much emphasis was placed by the defendant on the Moore patent No. 1,-864,750, which was issued in 1932. The lack of importance to the industry of the disclosure of that patent is demonstrated by the fact that there is no evidence in the record that the chair shown therein has ever been made or sold commercially in the 36 years since the patent issued.

63. Certain extremely significant elements of claims 1 and 3 are not found in the Moore patent relied upon by defendant. It is thus apparent that the Moore patent does not constitute an anticipation, as the defendant contends, of claims 1 and 3 of the patent in suit.

64. Claim 1 of the patent in suit calls for "movement of said tablet arm and * * * movement of said chair to different positions simultaneously as a cooperative assembly." The chair of the Moore patent does not have any such movement. When the claims of the patent in suit speak of various movements of the tablet arm and chair seat, such language applies only to movements between useful positions of those members, and there is no cooperative movement between useful positions of the tablet arm and chair seat of the Moore chair. There is, for example, no cooperative movement of the tablet arm with the chair seat in the Moore chair from the open position

(in which the set screw 49 of that chair must be tight) to the fully folded position unless the set screw is first loosened and the tablet arm is dropped to a non-useful position. If one wishes to open Moore's chair from its fully closed position, it is necessary to lift the tablet arm with the set screw loosened, and at the same time or subsequently to unfold the chair seat to its open position, and then finally to tighten the set screw while manually holding the tablet arm in the desired position of use.

65. The Moore chair does not have a rear pivotal connection operative for movement about a plurality of axes, as called for by claim 3 of the patent in suit. The pivotal connection at the rear of the Moore tablet arm provides only a single axis 62.

66. Claim 3 of the patent in suit calls for "movement of said arm with respect to said link in a plurality of directions." Because the movement referred to takes place at the pivotal connection at the forward end of the tablet arm, the movement in question must be angular movement. This feature is absent from the chair of the Moore patent.

67. The reliance by defendant upon the Moore patent as allegedly showing that the subject matter of the claims at issue was obvious to one skilled in the art is based upon a misunderstanding by defendant with respect to the structure and operation of the chair disclosed in the Moore patent.

68. The defendant's misunderstanding as to the operation of the Moore chair was illustrated by the repeated testimony of defendant's patent expert that when the chair of the Moore patent is folded from its open position of use (shown in Figure 1 of that patent) to a closed position while the set screw 49 remains tightened, the tablet arm rises automatically to the position in which it is approximately coplanar with the folded chair. This theory of operation of the Moore chair is shown to be wrong by the drawings of the Moore patent, from which it is seen that the set screw must be loosened to permit the relatively small portion of rod 48 which is exposed in Figure 1 to slide out so that a substantially greater portion of rod 48 may be exposed as in Figure 2, thus permitting the tablet arm to move to the closed position of Figure 2. The theory of operation of the Moore chair suggested by defendant's patent expert is also inconsistent with the Moore specification, is inconsistent with claim 4 of the Moore patent, and was proved wrong by the drawing of the Moore chair which was prepared by counsel for plaintiff and introduced in evidence as plaintiff's Exhibit 28.

69. The testimony by plaintiff's mechanical expert witness with respect to the operation of the Moore chair is entirely consistent with the drawings, specification and claims of the Moore patent. Although in his early testimony defendant's patent expert disagreed with the testimony of plaintiff's mechanical expert as to folding of the Moore chair from its Figure 1 to its Figure 3 position, subsequently defendant's patent expert conceded that plaintiff's mechanical expert's theory on this point was correct.

OTHER PATENTS RELIED UPON BY DEFENDANT TO SHOW IN-VALIDITY

*X-Frame Chairs*

70. The file history of the application which matured into the patent in suit reflects the significant differences which exist between an X-frame folding tablet arm chair and a Y-frame folding tablet arm chair, since the Patent Office Examiner did not apply any patent showing an X-frame chair as a primary reference against any of the claims of the application. Clarin patent No. 2,675,062 relates to an X-frame chair, and this patent was merely cited for the record and not applied against the claims. Likewise, the Examiner did not apply Clarin patent No. 2,664,943 (another X-frame chair) or Moore patent No. 1,864,750 (which is ½ X-frame and ½ Y-frame) against any of the claims, but merely cited them for the record.

500

### Clarin '062 and Clarin '943

71. In addition to being an X-frame chair, the chair of Clarin patent No. 2,-675,062 does not have a link pivotally connected to the seat, nor do the tablet arm and link slide relative to each other, as required by claims in issue in this lawsuit. Clarin 2,664,943 also does not have a link pivotally connected to the seat nor a tablet arm and seat which move as a cooperative assembly, and the tablet arm and link do not slide relative to each other.

### Eves et al. 3,024,065

72. In Eves et al. patent No. 3,024,-065, cooperative movement of the tablet arm and chair seat cannot take place with the tablet arm in the writing position until an unlatching adjustment similar to the loosening of the set screw in Moore is made. Even if such an unlatching adjustment is made, it is not at all certain that any cooperative movement will take place. In addition, the X-frame chair of the Eves et al. patent does not have a link pivotally connected to the seat, as required by the claims in this lawsuit. If the link of the Eves et al. chair were pivotally connected to the seat, the seat could not be folded.

### Supita Patent No. 2,676,645 and Adler Patent No. 2,719,574

73. Supita patent No. 2,676,645, which was at first applied by the Examiner against the claims but was subsequently withdrawn, does not disclose a chair having a tablet arm which moves about a plurality of different axes, nor does Supita's tablet arm move independently of the chair seat. Adler patent No. 2,719,574, shows a chair very similar to the Supita chair, and adds nothing to the Supita patent, as defendant's patent expert admitted.

### Watkins Patent No. 1,196,050

74. Watkins patent No. 1,196,050, which the Examiner first used as a secondary reference but subsequently withdrew, does not relate to a Y-frame chair, and in fact does not even relate to a folding chair. Although Watkins shows sliding movement at the front of the tablet arm, the other prior art patents do not teach any obvious combination with Watkins which would result in the invention of the patent in suit.

### Hamilton Patent No. 1,905,859

75. Hamilton patent No. 1,905,859 is similar to Watkins in that it discloses a stationary chair from which a two-way hinge might be borrowed. However, Hamilton shows even less than Watkins, because it does not show the sliding movement at the front of the tablet arm.

76. Although there is no evidence that the Hamilton, Adler and Eves et al. patents were considered by the Patent Office Examiner during the prosecution of Mr. Junkunc's patent application, these patents are no more pertinent than the patents which were considered by the Patent Office, and add nothing to the disclosure of those patents.

### The Junkunc Patent Discloses and Claims A New Combination of Functionally Co-operating Elements

77. The claims at issue define a folding tablet arm chair which includes a combination of elements which interact functionally with each other. Even though each of these elements, if taken separately, is not unique or patentable, it is the combination of these elements which is new and unobvious, and which produces a new result in that a unique and highly efficient folding tablet arm chair is produced. The invention disclosed in the patent in suit is not limited to any single element such as a joint structure, but covers the entire combination of elements called for by the various claims.

78. The combination of elements recited in the claims in issue contribute materially to the sum of useful knowledge in the chair industry. The combination of functionally cooperating elements, to which the claims in issue are directed, would not have been obvious at the time the invention was made to a person having ordinary skill in the art.

79. None of the disclosures relied upon by the defendant as purportedly anticipating, or rendering the invention of the patent in suit obvious, either discloses, teaches or suggests the novel combination of elements disclosed and claimed in the patent in suit. Although certain of the features of the patent in suit are shown piecemeal in some of the prior art patents, no one before Mr. Junkunc was able to combine these elements to provide a unique Y-frame folding tablet arm chair with cooperative and independent movement of the tablet arm with respect to the seat, which was a significant step forward in the chair industry.

### Mr. Junkunc's Invention Was Not Obvious

80. In the second Office Action on the application which matured into the patent in suit, the Patent Office Examiner concluded that the combination of references suggested by him in the first Office Action did not bar the allowance of the application, and the rejection based on those references was withdrawn. Defendant's attempted combination of eight prior art patents, all of which are the same as or no more pertinent than the references cited by the Examiner in the first Office Action, appears to be hindsight based on the disclosure of the patent in suit, which cannot be relied upon to show that the patented idea is obvious.

81. The dates of the prior art references relied upon by defendant shed a good deal of light on whether the invention of the patent in suit was in fact obvious to one skilled in the art at the time it was made. The Moore patent was issued in 1932, and in the 27 years between then and the year in which Mr. Junkunc filed his patent application, the Moore disclosure failed to suggest or even give a hint of this important invention. The Supita and Adler applications were filed in 1952, and seven more years went by without anyone thinking of the invention in suit, even by combining the teaching of those two patents with Moore or with the earlier patents to Watkins

or Hamilton as defendant's hindsight suggests might be done. Eves et al. was filed at about the same time as the application of Mr. Junkunc, and shows what different, complicated, and clumsy chairs other workers were developing. The failure by those working in the prior art and the success of the patentee is evidence that the patentee's contribution was not obvious.

### The Claims In Issue Are Clear And Definite, And Properly Define The Invention

82. The specification of the patent in suit describes the invention in full, clear, concise and exact terminology so as to enable any person skilled in the art to make and use the invention.

83. The claims in issue particularly point out and distinctly claim the folding tablet arm chair which forms the invention of the patent in suit.

84. The claims in issue cover a folding tablet arm chair assembly that includes a number of structural elements cooperating together to provide a Y-frame chair having both independent and cooperative movement of the tablet arm with respect to the chair seat. All of the elements set forth in the claims cooperate to provide Mr. Junkunc's unique and important development.

85. The claims of the Junkunc patent define an operable structure. None of the claims requires, as defendant has suggested, that one pivot axis necessarily be perpendicular to the plane of the tablet arm, and in addition, none of the claims requires, as defendant has suggested, that the tablet arm be raised from a fully closed position merely by manipulation of the chair seat.

86. All functional language used in the claims in issue is entirely appropriate because it (a) is either expressed in terms of "means" for performing the function specified or is fully supported in each claim by specific structure (such as a joint) for performing such a function; (b) clearly indicates to one skilled in the art a variety of specific structural

**502**

elements for performing the function specified, definite properties of such elements, or some definite interrelation between such elements; and (c) is described in structural detail in the specification.

87. A member of the public would have no trouble, because of any alleged functionality in any of the claims in issue, in telling whether or not what he is doing infringes those claims. The defendant purported to find in the prior art, in a piecemeal manner, features similar to the very features which it alleges are vague and functional. In the same manner that the meaning of the claims was clear and definite when defendant was trying to reconstruct the invention of the patent in suit from the prior art, the meaning of the claims is also clear and definite with respect to the readability of the claims on defendant's accused chair.

88. Anyone skilled in the art could readily understand what the claims in issue cover. Several claims recite that certain structural elements "permit" various operational characteristics of the claimed chair. The first portion of each of these claims sets forth "means" or structural elements, and the latter portion recites how those "means" or elements cooperate to achieve various operational characteristics through structure, properties or interrelations which are indicated to one who is skilled in the art by the language used in the context of the entire claim. In addition, all of the elements recited in the claims are clearly and definitely exemplified in detail in the specification and drawings of the patent in suit.

89. With the exception of "universal pivotal movement" and "maintain the [tablet arm] in position," all of the terms used in the claims in issue are ordinary English terms, which, when read in context, provide claims which are very easy to understand. The meaning of the terms "universal movement" and "maintain the [tablet arm] in position" as they are used in the claims is entirely clear from the specification, claims and drawings of the patent in suit.

90. There is no evidence that plaintiff has been inconsistent in its application of the claims in issue with respect to the accused chair. Several years ago counsel for plaintiff wrote to Clarin Manufacturing Co. stating that one of the chairs made by Clarin was covered by the patent in suit, as well as constituting a breach of a contractual obligation arising out of plaintiff's license to Clarin. The evidence indicates that this letter was sent as the opening move in an effort to obtain a royalty rate reduction from Clarin, and any assertion of infringement in that letter was not pressed by plaintiff, but on the contrary was effectively withdrawn by reason of its lack of pursuit by plaintiff.

*Expert Testimony*

91. The testimony by defendant's patent expert that certain claims should be construed in such a way that they would be valid but not infringed comprised legal conclusions which are the function of this Court to determine. The legal conclusions stated by defendant's patent expert on this question are inconsistent with the wording of the specification and claims of the patent in suit, the drawings of the patent in suit, the file history of the application which matured into the patent in suit, the chairs in evidence as physical exhibits, the courtroom demonstrations of the operation of those chairs, certain photographs in evidence, and certain uncontroverted testimony by the respective expert witnesses for the two parties, all of which constitute evidence which can be readily observed and understood by the Court without the need for testimony by any expert witness.

92. A major portion of the specification and claims of the patent in suit is simple enough for the Court to understand without the need for expert testimony. Helpful testimony was provided by Mr. Junkunc, the inventor of the patent in suit, Fred Stace, who is Vice President of plaintiff and is a person very

knowledgeable in the folding chair field, and Professor Cowie, who is an expert in the field of kinematics. The Court's own observations, together with the testimony of these three witnesses and certain testimony during cross-examination of defendant's patent expert, provide a basis for the Court's determination of the issues of infringement and validity of the Junkunc patent.

*Allegations of Misuse of Patent and Antitrust Violations Are Without Merit*

93. Plaintiff has granted licenses under the patent in suit to Clarin Manufacturing Co. (Clarin) and Hampden Specialty Products Corp. (Hampden). The license to Clarin, dated September 4, 1964, is royalty-free, and superseded a previous license given to Clarin in settlement of a lawsuit which was brought by Clarin against plaintiff. The license to Hampden executed on March 9, 1962 involves a royalty rate of 17½ cents per chair, which is considered by plaintiff to be unreasonably low and Mr. Junkunc, the president of plaintiff, regrets having granted this license.

94. Wishing to take advantage of plaintiff's past action in granting Hampden a license with a royalty rate of only 17½ cents per chair, the defendant requested a license from plaintiff "on the identical terms and conditions that were extended to Hampden." Plaintiff refused this request. On March 16, 1967, plaintiff offered defendant a license at a royalty of $1.60 per chair. This was meant as a starting figure, and prior to trial the proposed rate was reduced by plaintiff to 75 cents per chair. At 75 cents per chair, plaintiff's proposed royalty rate is less than seven percent of the price of defendant's accused chairs to dealers.

95. In the Hampden license, the parties agreed that in manufacturing chairs embodying the licensed invention, the respective parties "shall utilize their own designs," and the chairs of one party shall not be "identical in design to those being manufactured by the other party."

Plaintiff conditioned its offer of a license to the defendant on the condition "that the chairs manufactured by Poloron shall be the same as or similar to the chairs currently manufactured by it."

96. Much time preparing for the trial and at the trial was taken up in connection with defendant's charge that plaintiff had misused its patents and violated the antitrust laws because (a) plaintiff refused to grant defendant a license with the same royalty rate as the rate granted more than six years earlier to Hampden; (b) because of Hampden's expressed concern about charges of infringement from both plaintiff and Clarin, plaintiff, Clarin and Hampden had some joint license negotiations (although they finally executed separate licenses); (c) plaintiff's license offer to Poloron required that Poloron chairs made under the license "be the same as or similar to the chairs currently manufactured by it"; and (d) plaintiff brought this lawsuit against defendant without first offering defendant a license.

97. All of plaintiff's licensing practices and other actions in connection with the patent in suit are clearly reasonable and legal practices.

98. Defendant did not bother to take market surveys with respect to its charge. Defendant itself suggested a settlement with plaintiff which contemplated a reduced allocation of royalty payments to plaintiff because of defendant's concern about a possible charge of infringement against it by Clarin, just as Hampden had suggested to plaintiff six years before. These facts, taken together with the extreme lack of substance in the arguments presented by defendant in support of its patent misuse and antitrust charge, show that defendant was not really serious in its misuse and antitrust charge against plaintiff.

99. Each of the parties filed a brief directed solely to the antitrust issues of this lawsuit. The briefs of counsel, together with the evidence in the record, clearly establish that the plaintiff has not misused its patent and has not violated the antitrust laws, and that defend-

ant's counterclaim with regard to alleged antitrust violations is groundless.

### The Royalty Rate

100. Mr. Junkunc, president of plaintiff, testified that plaintiff considers it was a mistake to have granted Hampden a license at such a low royalty rate.

101. Although the defendant has asserted that the $1.60 per unit royalty originally requested by plaintiff "would make Poloron's chair impossible to sell," this assertion was not proved by defendant, and in any event it is clear that $1.60 was only a starting figure for negotiations. The evidence indicates that plaintiff is justified in seeking a much higher royalty rate than the 17½ cents royalty rate of the Hampden license. It would be economically deleterious to plaintiff's business to grant to Poloron a license at a royalty rate of only 17½ cents per chair.

102. To force plaintiff to grant a license to defendant at such a royalty rate would effectively be to create a system of compulsory licensing.

### The Restriction As to Form

103. Plaintiff has the right to limit its licenses to a specific form or forms of the invention, and to agree itself to forego manufacture of a specific form or forms of the invention. The devices to which the respective restrictions apply are covered by the patent, and such restrictions are reasonable as steps adapted to maintain individuality between manufacturers with respect to the designs of their respective chairs.

104. All the restrictions in defendant's licenses relate to chairs covered by the patent in suit. Defendant has not shown in any way that any of the restrictions are outside of the scope of plaintiff's patent monopoly.

### Lawsuit Prior to License Offer

105. Plaintiff has the right to sue Poloron for infringement without first offering Poloron a license. In its post-trial brief of the antitrust issues, the defendant has made the argument that the mere bringing of the present lawsuit, coupled with the demand that the defendant cease production of its infringing chair, was a misuse of the plaintiff's patent. The patent system of the United States would be of little value if a patent owner could not legally couple the bringing of an infringement suit with a demand that the accused infringer cease production of the infringing article.

### The Relevant Market

106. In many cases a customer who is in the market for folding tablet arm chairs will consider both (a) a folding chair having a tablet arm which folds only cooperatively with the seat and (b) a folding chair with a tablet arm that folds down alongside the chair in an out-of-the-way position. The customer might also be interested in (c) a non-folding or stationary-type chair having a tablet arm which folds down alongside the chair into an out-of-the-way position, or (d) a non-folding chair with a fixed tablet arm.

107. The determining factors as to which type of chair is selected are (a) the function or desirability of the unit, (b) the budget which is available to purchase the unit, and (c) the delivery time involved. Mr. Becker, vice president of defendant, pointed out that a chair in which the tablet arm folds only cooperatively with the seat will often be sold in preference to the accused chair "primarily because of price and delivery and primarily because they find it will meet the function that they need a folding tablet arm chair for, or a tablet arm." Mr. Stace, vice president of plaintiff, pointed out that a non-folding chair might sometimes be preferred over a folding chair.

108. One type of tablet arm chair, whether folding or not, can be substituted for another type of tablet arm chair in almost any situation, if budget or delivery considerations, or both, call for it. It is only if one assumes that some purchasers have a wholly fixed and inflexible need, that he must con-

clude that those purchasers will not accept any substitutions. There is no evidence as to how many customers have inflexible chair requirements, and the uncontroverted testimony of Mr. Stace indicates that one type of chair is commonly substituted for another.

109. It is only in a music room that it is very important to have a chair in which the tablet arm can fold to an out-of-the-way position, and a music department of a school is only one aspect of one type of purchaser. Moreover, a music department could obviously use a stationary chair with a tablet arm that folds to an out-of-the-way position.

110. The evidence clearly establishes that the true definition of the relevant market is *all chairs with tablet arms.* Applying this definition of the relevant market, the uncontroverted testimony of Mr. Stace shows that plaintiff's sales comprise at the most only five to ten percent of the market. Plaintiff obviously does not come close to having a controlling share of the market.

111. The evidence clearly indicates that it is not "essential" that a chair manufacturer be able to make plaintiff's patented chair. Plaintiff is only a minor member of the tablet arm chair industry, despite the fact that it is the owner of the patent in suit. Not all members of the tablet arm chair industry sell chairs made in accordance with the patent in suit.

112. The evidence makes it clear that plaintiff is lawfully seeking to control products made according to plaintiff's own patent. There is no evidence whatsoever that plaintiff is seeking to control the entire market in chairs having tablet arms, and in fact, the uncontroverted evidence is clear that plaintiff has only a small share of that market.

113. Poloron has forced Bela Seating into a long battle against Poloron to enforce the Junkunc patent. This fact has nothing to do with an alleged anti-competitive intent on the part of plaintiff, but arises solely from the unnecessary

multiplicity of defenses presented by defendant in the instant lawsuit.

114. Any Finding of Fact entered herein which may be properly construed in whole or in part as a Conclusion of Law shall be so deemed and treated as if set forth under Conclusions of Law.

## CONCLUSIONS OF LAW

1. Any Conclusion of Law entered herein which may be construed in whole or in part as a Finding of Fact shall be so deemed and treated, as if set forth above under Findings of Fact.

### JURISDICTION AND VENUE

2. This Court has jurisdiction over the parties to this suit and the subject matter of this suit, including the subject matter of the amended complaint, the amended answer and the amended counterclaim.

3. Venue is properly laid in this District.

### FACTS ALLEGED

4. Plaintiff is the owner of United States Letters Patent No. 2,954,073, entitled "Folding Tablet Arm Chair," which was duly and legally issued on September 27, 1960 to Bela B. Junkunc. Plaintiff has the right to sue for infringement and to seek an injunction against future infringement.

5. Plaintiff has proved the essential facts alleged in the amended complaint.

6. Defendant has failed to prove the essential facts alleged in the amended answer and counterclaim.

### INFRINGEMENT

7. Claims 1 through 7, 10, 12, 14 and 15 of the patent in suit, the only claims at issue, have been and are being infringed by defendant.

8. A mechanical or other technical expert may testify as to structural and operational features of the accused device, and it is the function of the Court to determine whether such structural and operational features are defined by the patent claims. The weight to be

506

given the expert's testimony should be left to the sound discretion of the Court in view of the qualifications of the expert, all the evidentiary facts in the record, and the rules governing construction of patent claims. Kohn v. Eimer, 265 F. 900, 902 (2 Cir., 1920); Hughes Aircraft Co. v. General Instrument Corp., 275 F.Supp. 961 (D.C.R.I., 1967); Old Mission Portland Cement Co. v. Commissioner of Internal Revenue, 69 F.2d 676 (9 Cir., 1934), aff. 293 U.S. 289, 55 S.Ct. 158, 79 L.Ed. 367 (1934); 2 Walker on Patents 1211 (Deller's Ed., 1937); Rogers, The Law of Expert Testimony 758, Matthew Bender & Company, Inc. (Werne Ed., 1941).

■ 9. Legal conclusions, such as whether a claim is infringed and whether a claim is valid, should be made by the Court, and opinions as to legal conclusions from a patent expert are never binding upon the Court. Minnesota Mining & Mfg. Co. v. Carborundum Co., 155 F.2d 746 (3 Cir., 1946); Moist Cold Refrigerator Co. v. Lou Johnson Co., 249 F.2d 246, 167 (9 Cir., 1957), cert. denied 356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1074 (1958); 1 Walker on Patents 272 (Deller's Ed., 1937).

■ 10. The Court is not obliged to follow blindly the testimony of any expert, even if uncontroverted by explicit testimony on the same point from another expert. The testimony of an expert witness on any opinion question, whether a question of technical opinion or legal opinion, must be considered in the light not only of any other opinion evidence in the record but also all factual evidence in the record, including the wording of the specification and claims of the patent in suit, the drawings of the patent in suit, the file history of the application which matured into the patent in suit, physical exhibits, courtroom demonstrations, photographs in evidence, and all other factual testimony and evidence in the record and of which the Court may take judicial notice.

■ 11. In determining whether or not defendant's chair infringes a claim of the patent in suit, "resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out, and that is the end of it." Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950); Ransburg Electro-Coating Corp. v. Nordson Corporation, 158 USPQ 385, 411 (N.D.Ill., 1968).

12. Because the term "universal pivotal movement" which occurs in claims 4 and 5 of the Junkunc patent has no established or accepted meaning, it is necessary and proper to resort to the specific definition from the specification to understand what the patentee meant by the term "universal pivotal movement" in his claims. Texas Company v. Globe Oil & Refining Company, 225 F.2d 725, 734–735 (7 Cir., 1955).

■ 13. It is a well established rule of patent law that every patentee is entitled to be his own lexicographer. Dennis v. Pitner, 106 F.2d 142, 148 (7 Cir., 1939); Northwest Engineering Corp. v. Keystone Driller Co., 70 F.2d 13, 15 (7 Cir., 1934), aff'd 294 U.S. 42, 55 S.Ct. 262, 79 L.Ed. 747 (1935); Advance Rumley Co. v. John Lauson Mfg. Co., 275 F. 249, 251 (7 Cir., 1921).

14. As original claims of the application as filed, claims 4 and 5 constitute part of the disclosure of the patent in suit.

15. The tablet arm of defendant's accused chair has universal pivotal movement with respect to the supporting link, as called for by claims 4 and 5 of the Junkunc patent.

■ 16. The definition of the invention is governed by the express terms of the patent claims, and resort to the specification to narrow a claim by interpreting a particular limitation in a certain way, in order purportedly to save the claim from being invalid over the prior art, is not permitted unless the claim is ambiguous because of the limitation in question. Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 277, 69 S.Ct. 535, 93 L.Ed. 672 (1949);

Borg-Warner Corporation v. Mall Tool Company, 217 F.2d 850, 856 (7 Cir., 1955), cert. den. 349 U.S. 946, 75 S.Ct. 875, 99 L.Ed. 1272 (1955); University of Illinois Foundation v. Block Drug Co., 133 F.Supp. 580, 589 (E.D.Ill., 1955), aff'd 241 F.2d 6 (7 Cir., 1957), cert. den. 354 U.S. 922, 77 S.Ct. 1382, 1 L.Ed.2d 1437 (1957).

17. Defendant's chair infringes claims 1 through 6 and 14 of the patent in suit on the basis of direct readability of those claims on the accused device.

18. Since the joint structure at the front of the tablet arm of defendant's accused chair performs substantially the same function in substantially the same way to obtain the same results as the true universal joint called for by claims 7, 10, 12 and 15 of the Junkunc patent, the defendant has taken over the essence of Mr. Junkunc's invention, using in its accused chair the mechanical equivalent of a true universal joint. This is an ideal case for the application of the doctrine of equivalents. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1949); Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147 (1929).

19. The accused chair differs in minor respects from the chairs shown as illustrative embodiments in the drawings of the patent in suit, but the scope of plaintiff's patent is not limited to the precise structures illustrated, since the claims of the patent measure the invention. King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 357 F.2d 875, 880 (7 Cir., 1966); Stuart W. Johnson & Co., Inc. v. Ro-Ber, Inc., 156 USPQ 177, 182–183 (N.D.Ill., 1967).

20. Having illustrated his invention and described his invention in the specification, a patentee may claim his invention as broadly as the prior art allows.

21. Defendant, which appropriated the principle and mode of operation of the Junkunc chair, and obtained its results by the same or equivalent means, may not avoid infringement by merely making the device different in form in minor respects. Nordberg Mfg. Co. v. Woolery Machine Co., 79 F.2d 685, 692 (7 Cir., 1935); Eversharp, Inc. v. Fisher Pen Co., 204 F.Supp. 649, 672–673 (N.D.Ill., 1961).

VALIDITY

22. Claims 1 through 7, 10, 12, 14 and 15 of the patent in suit, the only claims at issue, are good and valid in law.

23. A patent is presumed valid. 35 U.S.C. Sec. 282. The statutory presumption of validity "is not an idle gesture," and "is not to be overthrown except by clear and cogent evidence." King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 357 F.2d 875, 879 (7 Cir., 1966); Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772, 777 (7 Cir., 1961); Hazeltine Research, Inc. v. Dage Electric Company, Inc., 271 F.2d 218, 224 (7 Cir., 1959); Artmoore Co. v. Dayless Mfg. Co., 208 F.2d 1, 3 (7 Cir., 1953). Every reasonable doubt should be resolved against the defendant who is attempting to show invalidity. Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983, 985 (1937).

24. The presumption of validity cannot be weakened by reliance on prior art which was cited but not applied by the Examiner. On the contrary, the fact that the most pertinent prior art relied upon by defendant was considered and rejected by the Patent Office "greatly strengthens the presumption of the validity of the patent." Stuart W. Johnson & Co., Inc. v. Ro-Ber, Inc., 156 USPQ 177, 183 (N.D.Ill., 1967); King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 145 USPQ 596, 600 (N.D.Ill., 1965), aff'd 357 F.2d 875 (7 Cir., 1966); Ekstrom-Carlson & Co. v. Onsrud Machine Works, Inc., 298 F.2d 765, 768 (7 Cir., 1962); AMP Incorporated v. Vaco Products Co., 280 F.2d 518, 521 (7 Cir., 1960); Ransburg Electro-Coating Corp. v. Nordson Corp., 293 F.Supp. 448 (N.D.Ill., 1968).

25. The copying of the patented chair by defendant indicates its commercial importance and emphasizes the validity of the Junkunc patent. Shumaker v. Gem Manufacturing Co., 311 F.2d 273, 276 (7 Cir., 1962).

26. Moore patent No. 1,864,750 does not anticipate any of the claims at issue, since several of the essential elements of the claims are not found in the Moore patent and the defense of anticipation requires that all of the elements of a claim be found in a single piece of prior art. Stuart W. Johnson & Co., Inc. v. Ro-Ber, Inc., 156 USPQ 177, 181 (N.D. Ill., 1967).

27. As there is no evidence that the chair shown in the Moore patent has ever been made or sold commercially, this patent comes within the rule that "A prior art patent which has not contributed anything to the practical art, and is thus in the category of paper patents, should be strictly construed with respect to whatever teaching may be found in the same." Eversharp, Inc. v. Fisher Pen Co., 204 F.Supp. 649, 671 (N.D.Ill., 1961).

28. Defendant's attempted combination of individual features found in separate prior art patents to show that the invention of the patent in suit was obvious, was improper. The combination folding tablet arm chair of the Junkunc patent cannot properly be anticipated in a piecemeal fashion by combining individual features from different prior art patents when such combination is not taught by the prior art patents themselves. Imhaeuser v. Buerk, 101 U.S. 647, 660, 25 L.Ed. 945 (1880); Holstensson v. Webcor, Inc., 150 F.Supp. 441, 447 (N.D.Ill., 1957); Eversharp, Inc. v. Fisher Pen Co., 204 F.Supp. 649, 671 (N.D.Ill., 1961).

29. The patented folding tablet arm chair is a new combination resulting in an improved construction which accomplishes a new result and which is markedly more efficient than the prior art devices. Such a construction is patentable. Aerosol Research

Company v. Scovill Manufacturing Co., 334 F.2d 751, 755 (7 Cir., 1964); Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772, 781 (7 Cir., 1961); Anderson Company v. Sears, Roebuck and Co., 265 F.2d 755, 762–763 (7 Cir. 1959); Church of Religious Science v. Kinkead Industries, Inc., 234 F. 2d 573, 576 (7 Cir., 1956).

30. The failure of those working in the prior art and the success of the patentee is evidence that the patentee's contribution was not obvious. Pyle Nat. Co. v. Lewin, 92 F.2d 628, 630 (7 Cir., 1937); Eversharp, Inc. v. Fisher Pen Co., 204 F.Supp. 649, 671 (N.D.Ill., 1961).

31. Although many things seem obvious after they have been done, one cannot properly apply hindsight to attempt to determine what was obvious at the time the invention was made. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 434–435, 31 S.Ct. 444, 55 L.Ed. 527, 531–532 (1911); Ransburg Electro-Coating Corp. v. Nordson Corp., 293 F.Supp. 448 (N.D. Ill., 1968); Walt Disney Productions v. Fred A. Niles Com. Ctr., Inc., 369 F.2d 230, 234–235 (7 Cir., 1966); Shumaker v. Gem Manufacturing Co., 311 F.2d 273, 275–276 (7 Cir., 1962); Hazeltine Research, Inc. v. Dage Electric Company, Inc., 271 F.2d 218, 225 (7 Cir., 1959).

32. Defendant's use of eight different prior art patents in its attempt to invalidate plaintiff's claims tends in and of itself to negate the position of defendant that the patent in suit is invalid. Stuart W. Johnson & Co., Inc. v. Ro-Ber, Inc., 156 USPQ 177, 183 (N.D.Ill., 1967); King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 145 USPQ 596, 600 (N. D.Ill., 1965), aff'd 357 F.2d 875 (7 Cir., 1966).

33. The claims at issue are not functional at the point of novelty, since all of them clearly indicate to one skilled in the art a variety of specific structural elements for performing the functions specified, definite properties of such elements, or some definite interrelation

between such elements. No more is required. 35 U.S.C. Sec. 112.

34. The claims at issue are not broader than the disclosure because all of the elements recited in the claims coact with each other to produce a novel Y-frame tablet arm chair having both independent and cooperative movement of the tablet arm with respect to the chair seat. Claims covering a combination of elements, in which a new and functional result is achieved as a result of the coaction of the various elements of the combination, are valid. Church of Religious Science v. Kinkead Industries Inc., 234 F.2d 573, 576 (7 Cir., 1956).

### ALLEGED PATENT MISUSE AND ANTITRUST VIOLATIONS

35. The evidence clearly indicates that the plaintiff has not misused its patent, and has not violated the antitrust laws of the United States.

36. Plaintiff has no duty to grant a license to defendant under the patent in suit, merely because defendant has requested such a license. A patent owner has the right to grant a license to some, as he chooses, without granting a license to others. Extractol Process v. Hiram Walker & Sons, 153 F.2d 264, 268 (7 Cir., 1946); Radio Corporation v. Hygrade Sylvania Corporation, 10 F. Supp. 879, 882–883 (D.N.J., 1934).

37. A patent owner is not required to grant licenses to all comers at equal rates and terms. He may select or reject prospective licensees and prefer one over another for considerations within his discretion. United States v. Huck Manufacturing Company, 227 F.Supp. 791, 800, 803, 804 (E.D.Mich., 1964), aff'd per curiam 382 U.S. 197, 86 S.Ct. 385, 15 L.Ed.2d 268 (1965); United States v. E. I. Du Pont De Nemours & Co., 118 F.Supp. 41, 224 (D.Del., 1953), aff'd 351 U.S. 377, 76 S.Ct. 994, 100 L. Ed. 1264 (1956).

38. Although plaintiff need not justify different royalty rates among different licensees, plaintiff has shown that it was a mistake to grant Hampden a license at such a low royalty rate and plaintiff is not required to make the same mistake again. An owner of a patent may grant licenses to manufacture, use or sell upon conditions not inconsistent with the scope of the monopoly. General Talking Pictures Corporation v. Western Electric Company, 304 U.S. 175, 181, 58 S.Ct. 849, 82 L.Ed. 1273 (1938).

39. A patent owner who grants a license under his patent may restrict the licensee's product which falls under the licensed patent to a specific use or to a specific form. General Talking Pictures Corporation v. Western Electric Company, 304 U.S. 175, 181, 58 S.Ct. 849, 82 L.Ed. 1273 (1938); Vulcan Mfg. Co. v. Maytag Co., 73 F.2d 136, 138–139 (8 Cir., 1934); Reliance Molded Plastics, Inc. v. Jiffy Products, 215 F.Supp. 402, 408–409 (D.N.J., 1963); Harte & Co., Inc. v. L. E. Carpenter & Co., 138 USPQ 578, 583–584 (S.D.N.Y., 1963); Atlas Imperial Diesel Engine Co. v. Lanova Corporation, 79 F.Supp. 1002, 1003–1004 (D.Del., 1948). Plaintiff clearly had the right to restrict Hampden to the manufacture of chairs of Hampden's own design, and also to restrict defendant Poloron, if the latter accepted a license, to chairs which are "the same as or similar to the chairs currently manufactured by it."

40. Plaintiff had the right to restrict itself from making a chair identical in design with the chair being made by Hampden. Such a restriction embraces articles which fall within the scope of the patent in suit and has an effect that is similar to an exclusive license to Hampden to make chairs of its own design. Rail-Trailer Co. v. ACF Industries, Inc., 358 F.2d 15, 16–17 (7 Cir., 1966); Brownell v. Ketcham Wire & Mfg. Co., 211 F.2d 121, 129 (9 Cir., 1954); E. Bement & Sons v. National Harrow Co., 186 U.S. 70, 94, 22 S.Ct. 747, 46 L.Ed. 1058 (1902).

41. All of the restrictions in plaintiff's licenses to Clarin and Hampden

are reasonable and are within the scope of the patent monopoly.

■ 42. A patent owner has the right to bring an infringement suit against an infringer without first offering the infringer a license.

■ 43. Defendant has not met its burden of proof that any of plaintiff's actions are in restraint of trade or commerce and violative of Sec. 1 of the Sherman Act (15 U.S.C. Sec. 1).

44. Defendant has failed to prove that plaintiff has done anything that goes beyond the scope of the original patent monopoly. Hence, defendant's charges of violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. Secs. 1 and 2) must fail.

■ 45. Plaintiff does not control a "relevant market", nor has defendant shown that plaintiff has or ever had any unlawful intent to monopolize. These facts were matters that defendant was required to prove if it was to support its charges of violation of Section 2 of the Sherman Act. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); United States v. Aluminum Co. of America, 148 F.2d 416, 432 (2 Cir., 1945).

■ 46. Since plaintiff's sales comprise at the most only five to ten percent of the true relevant market of all chairs with tablet arms, plaintiff does not have the monopoly power that is required for violation of Section 2 of the Sherman Act.

47. Defendant's counterclaim charging violation of the antitrust laws has no basis in fact or in law. Defendant knew or should have known this, and its charge of antitrust violations against plaintiff was unreasonable and has required plaintiff to expend much time in defending this charge.

### RELIEF TO WHICH PLAINTIFF IS ENTITLED

48. Plaintiff is entitled to a permanent injunction restraining the defendant, its officers, agents and employees, and all persons controlled by or acting in concert or association with defendant, from further infringement of United States Letters Patent No. 2,954,073, and from further making, using, offering for sale or selling devices embodying the invention described and claimed in said patent.

49. Plaintiff is further entitled to an accounting of damages arising by virtue of the infringement by defendant of United States Letters Patent No. 2,954,-073 and for interest thereon. This cause should be continued with respect to the accounting issues pursuant to Rule 42 (b) of the Federal Rule of Civil Procedure.

50. Plaintiff is entitled to an award of costs with respect to the issues of patent validity and infringement and the antitrust counterclaim.