Owen Finlay MACLAREN and Miron Charles Bell, Plaintiffs,

v.

B–I–W GROUP INC., and Genesee Plastic Company, Inc., Defendants.

B–I–W GROUP INC., Counterclaim-Plaintiff,

v.

Owen Finlay MACLAREN et al., Counterclaim-Defendants.

No. 70 CIV. 5348 (MP).

United States District Court, S. D. New York.

Sept. 19, 1975.

288

Kane, Dalsimer, Kane, Sullivan & Kurucz, New York City, for plaintiffs Maclaren and M. C. Bell and counterclaim-defendants, by Joseph C. Sullivan, Charles R. Hoffmann, and Gerald Levy, New York City, of counsel, and Stevens, Davis, Miller & Mosher, Roger W. Parkhurst, Arlington, Va., of counsel.

Brumbaugh, Graves, Donohue & Raymond, New York City, for counterclaim-defendants General Recreation and Gerico, by Francis J. Hone, New York City, of counsel.

Gottlieb, Rackman, Reisman & Kirsch, New York City, by Michael I. Rackman and Barry A. Cooper, New York City, of counsel, Zimet, Haines, Moss, & Goodkind, New York City, by Howard I.

Rhine, New York City, of counsel, for defendants.

## OPINION

POLLACK, District Judge.

This is a suit arising under the patent laws in which the inventor and patentee, Maclaren, and his American licensee, Bell, charge defendants B–I–W Group Incorporated [1] and Cross River Products, Inc., with wilful infringement of United States Letters Patent No. 3,390,893, issued to Maclaren for "Structures for Folding Baby-Carriages, Chairs and the Like" on July 2, 1968.

In its answer, B–I–W denied infringement and asserted that the patent is invalid on the grounds of (1) obviousness and lack of novelty and utility, (2) insufficient disclosure of the invention, and (3) late claiming based upon public use. B–I–W also brought two counterclaims, the first seeking a declaratory judgment that the patent is invalid and not infringed and the second, which was subsequently withdrawn, alleging unfair competition on the basis of threats of suit made to B–I–W's sales representatives and customers. General Recreation, Inc. and Gerico, Inc. were joined as additional defendants on the counterclaim as sublicensees of Bell under an agreement signed in November 1972.

The Court concludes that the patent is valid and that it is infringed by defendants' stroller. Accordingly, judgment will be entered in favor of the plaintiffs against defendants [2] on liability for infringement, and B–I–W's counterclaim for a declaratory judgment of patent invalidity and non-infringement will be dismissed.

1. B–I–W Group Incorporated ("B–I–W" hereafter), formed under the name Best in the World, Inc., was merged into Cross River Products, Inc. on July 17, 1972 after this suit was filed. B–I–W also had two corporate predecessors, Brown Brothers Wilson, Inc. and Jefferson Leisure Products, Inc., to which occasional references were made in the record. For the sake of convenience, all these entities will be collectively referred to as B–I–W in this opinion.

2. Genesee Plastics Company, Inc. was also joined as a contributory infringer on the basis of its alleged manufacturing and supplying of parts to B–I–W. Genesee was dismissed from this suit at the close of the trial on the basis of a final judgment on consent entered into with plaintiffs.

The dispute in this action concerns the right to manufacture a type of collapsible baby stroller which has experienced stunning commercial success in the last several years and is now the best selling stroller on the market, according to the testimony of plaintiffs' trade expert.[3] The type of stroller involved in this suit is lightweight, but sturdy and may be collapsed with one hand into the compact shape of an umbrella,[4] rather than a bulky rectangle. As can readily be imagined, such a stroller would be particularly useful to parents travelling by subway or bus or living in non-elevator buildings and is stored easily in the trunk of the smallest compact car. The conception of this type of stroller is undeniably clever. However, the question as posed by B–I–W is whether Maclaren's creativity was that of an inventor or simply that of a skilled mechanic.

Owen Finlay Maclaren, the named inventor and owner of the patent herein, is presently a director of Andrews Maclaren, Ltd., a British company which manufactures and sells strollers of the type depicted in figure 4 of the patent in countries other than the United States under the trademark "BABY BUGGY". Maclaren has had a distinguished career in the field of engineering and design and is a member of the Society of Automotive Engineers, U.S.A. and an Associate Fellow of the Royal Aeronautical Society. Maclaren holds a number of patents in his name, most of them in the aircraft field and some of them relating to chairs or strollers. Some of Maclaren's work on aircraft undercarriages has been displayed at the Smithsonian Institute, and one of his strollers, of the type of figure 4 of the patent, has been displayed in the Museum of Modern Art.

Maclaren's patent application was filed with the United States Patent Office on July 18, 1966, claiming priority of Great Britain Applications 30,787/65 filed on July 20, 1965 and 34,181/65 filed on August 10, 1965. The British applications subsequently issued as British Patent No. 1,154,362. Following a number of amendments, the United States patent was issued on July 2, 1968; it is entitled to the 1965 filing dates of the British applications from which it claims priority pursuant to the provisions of 35 U.S.C. § 119. Maclaren first sold a product constructed in accordance with the teachings of the patent in or about February 1967 in Great Britain.

The first contact with the Maclaren stroller by any of the B–I–W principals[5] was in London in the summer of 1969 when Goodwin purchased a stroller and brought it back to the United States. In the fall, Goodwin demonstrated to Brown how the stroller collapsed and indicated that his child had liked it.[6] Three weeks later, Brown and Goodwin

3. Lew W. Throssel has been engaged in the marketing and administrative areas of the juvenile furniture business since 1951. He is presently President of Questor Juvenile Furniture Company. Although Questor is the largest juvenile sales company in the United States, its only attempt to enter the stroller market was unsuccessful. The Court finds that Throssel is qualified to testify as an expert on the marketing aspects of the Maclaren stroller.

4. The B–I–W stroller is identified by and marketed under the trademark "UMBROLL-ER".

5. At the times relevant to this litigation, Alexandre C. Goodwin was Chairman of the Board, Secretary and Corporate Counsel of B–I–W; D. Deaver Brown was Director, President and Treasurer; and James L. Sloan was Director and Vice President. Their backgrounds were in law, business and engineering respectively.

6. During 1971 and 1972 at least one newspaper article appeared which could give the impression that the idea of the UMBROLL-ER type stroller was conceived by the principals of B–I–W without the benefit of the Maclaren stroller while they were sitting at home one evening trying to think of a new product that would be useful for their wives and children. The testimony by the principals introduced at trial indicates that such an impression would be plainly incorrect.

decided to pursue the stroller as a "business problem" for their company which at that time had venture capital but no product. At a third meeting they discussed the fact that the stroller was patented, as well as their research into possible new markets which their company might enter. They concluded that entry into the juvenile furniture market would be relatively easy because the industry was badly managed and the capital requirements were low.

On December 27, 1969, Goodwin wrote to Maclaren indicating that they were "sincerely impressed" with the patented BABY BUGGY and inquiring whether Maclaren would be interested in negotiating with them concerning the manufacture of the stroller. Maclaren replied that he had licensed Bell to manufacture products under the patent in the United States.[7] Goodwin in turn arranged a meeting with Bell in January 1970 to discuss a sub-license under the Maclaren patent. Brown and Goodwin indicated to Bell that their thinking about manufacturing the stroller was just in an exploratory stage at that point.

In January or February 1970, Goodwin and Brown decided to bring Sloan in on their review of the stroller, to consider technical production questions about costs. Sloan examined how the parts of the Maclaren stroller were manufactured and assembled. Goodwin, a lawyer, began reviewing the Maclaren patent itself and later consulted a patent lawyer named Booth. In February, Goodwin told Brown that he was pretty sure, but not positive, that the Maclaren patent was invalid.

Goodwin and Brown met again with Bell on February 27, 1970 to continue discussion of a sublicense. Goodwin told Bell that he thought that there were weaknesses in the patent, but Bell did not agree. Brown and Goodwin thought that Bell's price was too high for them

to manufacture under a sublicense, and they decided that Goodwin would complete the patent search.

Goodwin and Brown made their final overture to Bell by letter in early March, indicating that B–I–W intended to manufacture a non-infringing product which would be highly competitive and suggesting that Bell cooperate with them in attacking the market. Goodwin again reiterated their doubts about the validity of the patent and suggested that Bell undertake a critical examination by patent counsel. Bell never responded to that letter.

On March 15th, Brown, Goodwin, Sloan and Booth met to discuss the stroller. Brown indicated that he did not want to get involved with a product that would drag them into court and that he was skeptical about proceeding with the stroller. Goodwin and Booth argued on the basis of 30 to 50 patents that somebody else had previously developed the stroller idea and were ultimately able to convince Brown that the patent was invalid or could be found to be invalid.

The first B–I–W prototype was produced in May or June of 1970. Sloan testified that the parts of the Maclaren stroller were not duplicated, but that B–I–W tried to construct a stroller with similar structural components and that a majority of the parts of the first prototype were similar to those of the Maclaren stroller. A comparison of the Maclaren BABY BUGGY and the B–I–W UMBROLLER strongly suggests that such testimony constitutes a rather disingenuous understatement.

On August 27, 1970, Goodwin wrote to Maclaren, stating that they believed the patent to be invalid, or, if not invalid, easily circumvented and that they had:

> . . . every intention of entering the subject market with a highly collapsible item, and we are at this time

---

7. Brown subsequently inquired in January 1970 about the possibility of manufacturing a shopping cart using the BABY BUGGY design, but Maclaren replied that Bell also had the rights under the patent to manufacture a shopping cart.

actively engaged in preparations toward that end. Prior to undertaking a critical examination of the patent to you, we had already identified reasonable alternatives in the prior art. A competitive alternative is still under consideration; however, pending one remaining cost decision, *we shall probably commence the manufacture and distribution of a model allegedly covered by the patent to you.* (Emphasis added)

Goodwin then indicated that if the asserted defects in the patent, which were identified in an accompanying memorandum, could be corrected, B–I–W would be prepared to negotiate within a framework specified in the letter. No agreement was ever reached between Maclaren and B–I–W. The latter proceeded with the manufacture and marketing of its unpatented folding stroller through a subcontractor and a subsidiary and this suit was thereafter filed on December 7, 1970.

## THE PATENT

United States Letters Patent No. 3,390,893 for "Structures for Folding Baby-Carriages, Chairs and the Like" was issued with one independent claim describing the basic structure and 14 dependent claims describing various refinements in the structure. Claim 1 of the patent defines a collapsible support assembly consisting of a bottom cross frame and a back cross frame each consisting of interpivoted rigid members. Two-axes pivot joints interpivotally attach one of each of the bottom frame members to one of each of the back frame members at each of two corners of the cross frames to permit the members of each cross frame to pivot with respect to each other and to permit the cross frames to pivot with respect to each other. Two foldable brace members are pivotally attached to the bottom cross frame near the other two corners of the bottom cross frame respectively and to the back cross frame near the other two corners of the back cross

frame respectively. The "first releasable means" holds the members of at least one of the cross frames in an extended position when the assembly is unfolded. (Members 9A, 9B and knuckle joint 10 in the drawings) The "second releasable means" holds the foldable brace members in an extended position when the assembly is unfolded.

The structure must permit two types of movement: (1) each cross frame must be permitted to widen or contract and (2) each cross frame must be permitted to collapse as a whole on to the other cross frame. When the structure is in the extended position, the same two types of folding movement must be prevented. Collapse of one cross frame on to the other is prevented by keeping the side braces extended. Prevention of inward or outward folding of the side braces is the function of the "second releasable means".

As mentioned in the specification, there are many folding structures of this kind, and most of them fold "flat"; that is to say their extended and basically 3-dimensional envelope, is foldable into a basically 2-dimensional envelope disregarding the obviously necessary structural volume when folded. The invention is concerned with structures which may be colloquially described as "stick folding" as compared to "flat folding", i.e., a three dimensional structure which is foldable in effect into a single dimension in the same sense as an umbrella, rather than into two dimensions in the same sense as an ordinary *bridge chair.* The specification and drawings disclose simultaneous folding in the two dimensions, the collapsing action of the back and bottom frames being accompanied by the breaking of the braces so that the corners of the bottom frame rise toward the upward folding position depicted in figure 2 of the patent. The specification indicates that such a structure when folded may be easily stored and when extended may be lightweight yet sturdy.

The specification and accompanying drawings describe in particular two baby strollers or carriages as examples of the invention, but the specification expressly indicates that the invention also contemplates folding chairs, invalid chairs, shopping carriers "or any such article, where a three-dimensional structure is required to be folded into a stick-like formation".

## INVALIDITY OF THE PATENT

■ Simply stated, the conditions of patentability are: novelty, utility, and unobviousness, provided the right to patent has not been lost, and full disclosure. B–I–W argues that the patent is invalid on three basic grounds: (1) the patent does not adequately disclose the claimed invention as required by 35 U.S.C. § 112, (2) the claimed invention is neither useful, nor novel, nor non-obvious as required by 35 U.S.C. §§ 101, 102 and 103, and (3) certain features of the invention were in public use more than one year before they were claimed in the patent application.

### 1. *Disclosure*

■ No invention can be patented unless it is so fully disclosed that the public is enabled to use it. This is the quid pro quo given in exchange for the temporary right to exclude.

■ B–I–W's expert Gambrell[8] testified that if the stroller actually produced by Maclaren represents his invention, the patent itself does not adequate-

ly disclose or claim that invention. Section 112 of Title 35 provides that:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

■ The purpose of this requirement for an "enabling disclosure" is twofold: first, to enable those skilled in the art to understand and apply the teaching of the invention, and second, to avoid uncertainty as to the scope of the invention which might discourage enterprise and experimentation. *Georgia-Pacific Corp. v. United States Plywood Corp.*, 258 F.2d 124, 136 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L. Ed.2d 112 (1958). Whether the inventor has met the statutory requirement is determined by inquiring whether the disclosure of the patent—the technical description with drawings—is sufficient to enable one skilled in the art to make and use the product without undue experimentation. *Ansul Company v. Uniroyal, Inc.*, 448 F.2d 872, 879 (2d Cir. 1971), cert. denied, 404 U.S. 1018, 92 S. Ct. 680, 30 L.Ed.2d 666 (1972). The claims that appear in the patent following the specification are also part of the specification. They are separate, legal-

---

8. The experts who testified for the parties respectively each have impressive technical backgrounds. Gambrell has been a university professor of law teaching patent law since 1966. Prior to that time, he was engaged in the practice of patent law. The Court finds that he is qualified to testify as an expert. The two mechanical experts who testified at trial are Don A. Fischer for plaintiffs and Ferdinand Freudenstein for defendants. Fischer is presently a consulting engineer, registered as a professional engineer in Missouri and Colorado and admitted to the Bar in Missouri. Fischer in the course of 25 years was a professor and uni-

versity Dean of electrical and industrial engineering prior to his becoming a consulting engineer, during which period he taught courses and worked on projects involving mechanical and engineering problems. Freudenstein has been a university professor of mechanical engineering since 1959, has published numerous articles in the area of mechanical engineering, and has received a number of grants from the National Science Foundation. The Court finds that both Fischer and Freudenstein are qualified to testify on the mechanical aspects of the Maclaren patent.

ly-technical definitions of the invention covered by the patent, defining the scope of the patentee's protection.

B–I–W contends that the disclosure in the Maclaren patent is inadequate in the following respects: (1) the working of the pivot joint described in claim one, (2) the elements constituting the second releasable means described in claim 1, and (3) the point of connection of the seat and wheel struts to the foldable brace members.

The two types of folding movement described in claim 1 require movement about at least three axes. B–I–W contends that claim 1 discloses a pivot joint allowing movement about only two axes and therefore describes an inoperable device which is an inadequate recitation under § 112. *See Indiana General Corp. v. Krystinel Corp.*, 297 F.Supp. 427, 441 (S.D.N.Y.1969), *aff'd*, 421 F.2d 1023 (2d Cir.), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970). The relevant language of claim 1 is as follows:

. . . a two-axes pivot joint interpivotally attaching one of each of the bottom frame members to one of each of the back frame members at each of two corners of said cross frames, said axes being oriented to permit the members of each cross frame to pivot with respect to each other and to permit said cross frames to pivot with respect to each other . . .

Maclaren contends that the language of claim 1 taken as a whole does disclose an operable pivot joint, a third axis being provided by the phrase "interpivotally attaching" read in conjunction with the remainder of claim 1 which discusses the type of relative movement which the pivot joint must permit.

 The Courts have recognized the problems posed by the inexactitude of language in an area requiring precision of description, *e.g., Georgia-Pacific Corp. v. United States Plywood Corp.*, 258 F.2d 124, 136 (2d Cir.), *cert. denied*,

358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958), and it has been said that an inventor may be his own lexicographer. *E.g., Bela Seating Company v. Poloron Products, Inc.*, 297 F.Supp. 489, 506 (N. D.Ill.1968), *aff'd*, 438 F.2d 733 (7th Cir.), *cert. denied*, 403 U.S. 922, 91 S. Ct. 2228, 29 L.Ed.2d 701 (1971). The function of claims is to define the scope of the invention; it is not their function to describe the embodiment. Claims are legal definitions, not descriptions. Disclosure is further performed by the patent specification and accompanying drawings which may elucidate the claims of the patent. *Shaw v. E. B. & A. C. Whiting Co.*, 417 F.2d 1097, 1106 n.11 (2d Cir. 1969) *cert. denied*, 397 U.S. 1076, 90 S.Ct. 1518, 25 L.Ed.2d 811 (1970); *Autogiro Company of America v. United States*, 384 F.2d 391, 398, 181 Ct.Cl. 55 (1967); *see United States v. Adams*, 383 U.S. 39, 48–49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

 The Court concludes that claim 1 read in conjunction with the specification and figures 1, 2, 3 and 4 adequately discloses the nature of the claimed pivot joint to one skilled in the art. Claim 1 and the specification adequately disclose the nature of the two types of folding which must be permitted. A comparison of figures 1 and 4 with 2 and 3 illustrates the "before" and "after" results of the folding. The mechanical principles involved in the operation of the Maclaren strollers are not particularly complicated, and it seems most probable that one skilled in the art would readily realize that three axes of movement would be required to accomplish the type of folding described and that "interpivotally attaching . . ." described the third axis. Moreover, the drawings in the patent suggest the relatively simple hardware—two L shaped brackets and 3 pins—which may be used to achieve the desired result.

Claim 1 includes a "second releasable means to hold said [foldable] brace members in an extended position when

the assembly is unfolded." Section 112 provides in pertinent part that:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Maclaren contends that the second releasable means consists of the knuckle joints (parts 7B and 8B in figures 1 and 4 of the patent) plus either the seat struts (12A and 12B in figures 1 and 4) or the wheel struts (40, 41 in figure 4, not contained in the figure 1 embodiment of the patent) or both sets of struts. B–I–W contends that the disclosure of the second releasable means is inadequate and is in fact limited to the knuckle joints. B–I–W further contends that a second releasable means limited to the two knuckle joints would have been obvious in light of the prior art which is discussed below.

If the second releasable means is to "hold" the foldable brace members extended, it must prevent both inward and outward folding. The knuckle joint will prevent outward fold, but does nothing to prevent inward fold. Both mechanical experts agreed that if neither set of struts were present, the foldable braces would collapse when inward pressure was applied, for example by the weight of a baby placed on the seat. B–I–W's expert testified, however, that because of the special cooperation of all the members of the structure, the struts do not contribute anything more to the function of the second releasable means than the other members do. While it is true that the rigidity of the structure depends on the interaction of all the members, the struts do contribute to preventing inward folding of the side

braces in a more direct sense than the other members.

The Court concludes that since the function of the second releasable means is to "hold" the side braces extended, a mechanic skilled in the art would readily and necessarily infer that the second releasable means consisted of something beyond the knuckle joints in order to prevent inward folding of the side braces and that that something would be the seat and wheel struts connected to the side braces. Claim 1 itself defines only the function of the second releasable means.[9] As § 112 indicates, one may look to the specification or its equivalent for a description of the components of the second releasable means. B–I–W properly points out that any express reference in the specification to the seat struts and the wheel struts by member number is in the apparent context of supporting the seat or the wheels. (col. 3, lines 53–59; col. 4, lines 29–37). This does not necessarily preclude their performing an additional function, and Maclaren's mechanical expert testified that the role of the struts as part of the second releasable means is implicitly recited in the description of the folding movement in column 4, lines 6–12 of the patent specification, which refer the reader to figures 2 and 3 as well. If one follows in figure 2 the nature of the folding movement described in column 4, the role of the struts and the sense in which they are "releasable" from the locked or extended position becomes apparent. Moreover, both figures 1 and 4 illustrate that the seat struts in the former and both the seat struts and the wheel struts in the latter perform the function of the second releasable means of keeping the side braces extended by preventing inward fold. While it may be that one skilled in the art would have to think a bit about the components of the second releasable means, the drawings and the specification considered in

9. Claim 10 defines "an assembly as claimed in claim 1, wherein said second releasable means comprises a pair of strut members, each pivotally connected to one of said brace members and to a cross-frame."

light of the relatively simple mechanical principles embodied in the stroller nonetheless meet the disclosure requirements of § 112.

B–I–W attempted to demonstrate by a mechanical experiment at trial that the point of connection of the seat strut to the brace element, which rigidly fixes the pivoting length of the strut, must be selected with precision in order to prevent any undue bending pressures on the joints which would otherwise result as the fixed length of the strut rotates through the required folding action. B–I–W pointed out that the proper connection point is not even remotely indicated in the patent drawings and argued that the drawings must precisely locate that point since the role of the seat and wheel struts as part of the second releasable means is at best disclosed by mere implication in the claim and specification.

 The test of disclosure, however, is only that one skilled in the art must be able to ascertain the invention without undue experimentation. Maclaren's mechanical expert testified that the proper location of the connection points for the struts could be determined either through the use of drafting with proper scale and perspective, which the patent drawings do not purport to present,[10] or through trial and error with an actual model. The Court finds that the patent discloses sufficient information to enable one skilled in the art to succeed with either or a combination of both approaches without undue experimentation.

2. *Utility, Novelty and Non-obviousness*

 In order for a claimed invention to be patentable, it must be new and useful, 35 U.S.C. § 101, and meet the requirements of novelty under § 102 and satisfy the requirement of non-ob-

viousness under 35 U.S.C. § 103. *E. g.*, *Graham v. John Deere Co.*, 383 U.S. 1, 12, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The statutory bar, 35 U.S.C. § 102, is a one year time bar. If the applicant's invention is described in a patent or publication anywhere, or is in public use or on sale in this country more than one year before he files his application (no matter when he made the invention), there is a loss of right to a patent.

The requirement under § 103 is that:

A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Mere novelty is not enough to satisfy the requirement of non-obviousness. The Supreme Court delineated in the *Graham* case three inquiries to be made in applying the test of non-obviousness: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims of the inventor, and (3) the level of ordinary skill in the pertinent art. Attention may also be given to such secondary considerations as the commercial success of the claimed invention, the meeting of long felt, but unsolved needs, and the failures of others, etc. 383 U.S. at 17, 86 S.Ct. 684.

 The judicial investigation is to determine § 103 unobviousness, not the presence or absence of "invention." There is always an invention before the Court; the issue is its patentability. The question is determined as to the subject matter as a whole (i. e., the whole invention) and as of the time the invention was made with reference to a person having ordinary skill in the art (somewhat analogous to the "ordinary reasonable man" of negligence law).

---

10. There is no requirement that the drawings accompanying the patent as permitted by 35 U.S.C. § 113 be so detailed as to be production specifications. *Trio Process Corpora-* *tion v. L. Goldstein's Sons, Inc.*, 461 F.2d 66, 74 (3d Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972).

■ The pertinent prior art is that to which one could reasonably be expected to look for a solution of the problem which the patented device attempts to solve. *Burgess Cellulose Co. v. Wood Flong Corp.*, 431 F.2d 505, 508–509 (2d Cir. 1970). The Maclaren patent indicates that the invention is directed toward a structure for a baby carriage or the like which is stickfolding as opposed to flatfolding, compact and lightweight, yet sturdy. Maclaren argues in effect that one would look simply to folding strollers or other similar juvenile items. B–I–W argues that the claimed invention pertains to a collapsible support assembly without limitation as to its potential use and that the relevant prior art therefore encompases the particular subfield of collapsible support assemblies (which in general would extend from ladders to drawbridges) which are stickfolding as opposed to flatfolding, without limitation as to potential use.

■ By its very terms, the patent is not limited to strollers. It also expressly speaks of folding chairs, shopping carriers, and invalid chairs. Maclaren himself wrote to Brown that the license agreement with Bell covered the manufacture of shopping carts under the patent. In the context of the adequacy of disclosure by the patent, Maclaren indicated that the appropriate art was that of folding structures in general. At the same time, however, the use of the phrases "and the like" and "any such article" does provide a meaningful if somewhat vague limitation to the reach of the patent and the appropriate prior art to be considered.

■ The Court concludes that the relevant prior art is defined by stick-folding collapsible support assemblies used for strollers and for seating and carrying purposes in closely related fields. Reference to particular collapsible support assemblies beyond this would be relevant in this case only insofar as they disclosed mechanical principles and applications widely known throughout the useful arts. *See Supreme Equipment & Systems Corp. v. Lear Siegler, Inc.*, 495 F.2d 860, 862 (2d Cir. 1974).

The Patent Office considered the Maclaren application in light of the Moss, Altruda, and Tapiovaara United States Patents and the Morin French patent and initially rejected the key claims of the application as unpatentable under § 103. Maclaren ultimately distinguished these prior art references by emphasizing that the cross frames and pivotal connections of the claimed structure provided sufficient rigidity and freedom of movement to obviate the need for the heavier, more complicated structures disclosed by the patents cited by the examiner.

■ B–I–W, referring to prior patents for both strollers and collapsible support assemblies for other uses, argues that the most pertinent prior art was not considered by the Patent Office.[11] B–I–W's expert witnesses based their discussion of obviousness and the prior art primarily upon the Shibazaki stroller patent (Japan No. 24216, March 18, 1926), the Turner patent for a foldable frame for holding work on a sewing machine (United States No. 146,110, December 20, 1893), the Nickles collapsible tent patent (United States No. 1,773,847, August 26, 1930), and the Martinson patent for a collapsible frame for a churn (United

11. Once issued, a patent is presumed by statute to be valid. 35 U.S.C. § 282. However, the weight to be given that presumption may be undercut in general by the administrative burdens on the Patent Office of the increasing number of patent applications and the *ex parte* nature of the application proceeding and in particular cases by the failure of the Patent Office to consider appropriate prior art references raised by the alleged infringer at the trial on the merits. *E. g., Kahn v. Dynamics Corp. of America*, 508 F.2d 939, 942 (2d Cir. 1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975); *Lemelson v. Topper Corp.*, 450 F.2d 845, 849 (2d Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1253, 31 L.Ed.2d 456 (1972). *See generally Koppers Company, Inc. v. S & S Corrugated Paper Machinery Co., Inc.*, 517 F.2d 1182 (2d Cir. 1975).

States No. 1,250,923, December 18, 1967).

■■■ Shibazaki discloses the use in a stroller of a stickfolding collapsible support assembly and at first glance appears to be identical to the Maclaren stroller's triangular orientation of two X frames connected by two side braces. The side braces, however, are not foldable and the bottom and back frames, each consisting of parallel as well as cross members, are connected to the side braces by slides rather than by pivot joints. The cross frames in the Shibazaki stroller fold away from each other, ultimately lying one next to the other in the same plane when folded and thus provide a longer item when folded than when opened. Since the side braces are not foldable, Shibazaki does not disclose a "second releasable means" to hold them extended. It does disclose the use of toggle bars to keep the cross frames extended, the function of the first releasable means in the Maclaren patent. The Shibazaki stroller discloses simultaneous two dimensional folding, although six operations of unlocking are required before folding may be commenced. It would not have been obvious to a person skilled in the art to modify and rearrange the Shibazaki mechanism to the permutation defined in claim 1 herein.

The Turner patent covers a collapsible frame for holding work on a sewing machine and may be considered part of the relevant prior art. The structure discloses a triangular orientation between a bottom and back frame, each consisting of two parallel members and a "lazy tongs" cross member, and two foldable side braces, which permit inward folding. There is, however, no structure to keep the braces extended when the structure is unfolded, and Turner thus does not disclose a second releasable means. Moreover, the means by which the lazy tongs of the two frames are kept extended, which would be analogous to the first releasable means, is not organic to the structure, but rather is provided by positioning the two clamps of the bottom frame at a desired width apart on another object. Finally, the structure discloses stick folding, although the two dimensional folding is not simultaneous since the two frames and the side braces are not interconnected and widening or narrowing the lazy tongs does not cause them to fold downward onto each other.

The Nickles collapsible tent does not fall within the scope of the prior art as defined by the Court. The Nickles tent frame is wholly unsuited for *use* as a stroller or the like; it includes many structural differences from the structure of the present invention. Assuming *arguendo* that the Nickles tent falls within the scope of the prior art, the only additional element which Nickles could be said to disclose would be a "second releasable means" of dubious utility to a stroller. The equivalent of a foldable side brace in the Nickles tent is the foldable brace running along the ground and connecting the two sides. This brace is held in the extended position by the ground and a rope insofar as downward break is prevented, but there is no structure which prevents an upward break in the brace.

The Martinson patent which discloses a collapsible frame for holding a churn is also cited as part of the relevant prior art; it is unsuitable for use as a stroller or the like. As with the Nickles tent, the Martinson churn frame does not disclose a "back" and "bottom" frame, but rather two "side" frames. The cross members of the frames in Martinson are not interpivoted, nor are they rigid. Each cross frame is held extended by a strut which is detachable at one end. A foldable side brace connecting the two cross frames is kept extended, insofar as preventing it from breaking downward is concerned, by a knuckle joint. The normal forces on the structure do not pose the problem of an upward break while the side brace is in an extended position.

The other stroller references cited by B-I-W are the Scorey patent (United

States No. 1,300,033, April 8, 1919); the Tailland patent (Britain No. 305,928, May 5, 1930) and the Hurvitz patent (United States No. 3,094,339, June 18, 1963). Scorey and Tailland do not add anything to the prior art as delineated by B–I–W's primary references, although it is worth noting that Tailland demonstrates simultaneous folding. Hurvitz does disclose a foldable side brace with a knuckle joint and seat strut, but not in the context of a stick-folding stroller with a relatively small number of specially cooperating parts.

The other non-stroller collapsible support assembly references cited by B–I–W are the Maclaren chair (United States No. 3,124,387, March 10, 1964); the Giordano collapsible shopping cart (United States No. 2,421,751, June 10, 1947); the Edwards folding chair (United States No. 1,299,826, April 8, 1919); and the Burda collapsible window platform (United States No. 2,085,572, June 29, 1937). None of these patents add anything to the primary references cited by B–I–W.

Maclaren's mechanical expert testified that there was nothing new about the individual elements of the Maclaren invention. This is not unusual. Substantially all mechanical inventions are combinations of elements, generally all old elements.

As Judge Learned Hand observed in *Safety Car Heating & Lighting Co. v. General Electric Co.*, 155 F.2d 937, 939 (2d Cir. 1946):

> Substantially all inventions are for the combination of old elements; what counts is the selection, out of all their possible permutations, of that new combination which will be serviceable.

Judge Learned Hand phrased the crux of the matter in *B. G. Corp. v. Walter Kidde & Co.*, 79 F.2d 20, 22 (2d Cir. 1935):

> All machines are made up of the same elements . . . But the elements are capable of an infinity of permutations, and the selection of that group which proves serviceable to a given need may require a high degree of originality. It is that act of selection which is the invention.

See also *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.*, 372 F.2d 263, 268 (2d Cir. 1967).

 The prior art references indicate that the use of a stick-folding structure in collapsible support assemblies in general and in strollers in particular was known prior to the Maclaren patent. Simultaneous folding in two dimensions was also known in strollers as indicated by Shibazaki and Tailland. Moreover, the prior art discloses the use of cross frames, pivot joints, toggle bars, foldable side braces, knuckle joints, and struts in folding structures. However, no single item of prior art shows the complete combination.

To invalidate the claim it must be shown that the combination was obvious, not merely its components. And the Court must avoid the temptation of hindsight to read into the prior art the teachings of the patent itself. *E.g., Graham v. John Deere Co.*, 383 U.S. 1, 36, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

The critical question is thus whether the Maclaren arrangement would have been obvious to a mechanic of ordinary skill in the art having the prior art in mind. *See Supreme Equipment and Systems Corp. v. Lear Siegler, Inc.*, 495 F.2d 860, 862 (2d Cir. 1974).

The Maclaren invention introduced the novel feature of simultaneous one-hand folding of the structure. As one presses on the side braces, the bottom of the stroller folds upward as a result of the cooperation, as controlled by the first and second releasable means [12] of the relatively small number of parts required for the Maclaren structure. The end result is greater than one would expect from a combination of each of the individual components in the stroller.

---

12. As indicated above, the Court finds that the second releasable means consists of the knuckle joints plus either the seat struts or the wheel struts or both.

B–I–W contends that this type of folding and cooperation would have been obvious to one skilled in the prior art by adding the foldable side braces disclosed in Turner, Martinson, and Nickles to Shibazaki which disclosed simultaneous folding. While such a combination could permit the inward folding demonstrated by the Maclaren invention which permits the reduction in the folded length of the structure, it would not have been obvious to one skilled in the prior art how to retain the characteristic of simultaneous two-dimensional folding once that change is made in Shibazaki since the simultaneous folding demonstrated by Shibazaki depends on the side braces remaining rigid. As Judge Medina stated in *Ling-Temco-Vought, Inc., supra,* at 268–9:

> It is apparent that the more numerous the references and the more remote the cited art from the subject matter of the patent in suit, the less likely it becomes that a person having ordinary skill in the art would have arrived at the result reached by the patent in suit.

> It is only the guidance of hindsight, admittedly superior to foresight, which makes it easy now to see how the elements of various prior art can be combined to create a new, unique, useful subject matter which was previously unobvious.

■ Moreover, even if it were assumed that a person of ordinary skill in the art, given the assignment of producing a one-hand foldable stroller, could, by the exercise of routine talent, select the proper mechanical elements from the prior art and properly combine them, it would not necessarily follow that the invention was obvious, because the invention required the additional, prior step of perceiving one-hand foldability as a desirable goal.

> . . . it does not negate patentable invention merely to establish that a desirable goal, once perceived, could have been reached by the exercise of routine skill.

\* \* \* \* \* \*

Patentable ingenuity may be involved in the perception of the goal. *Plantronics, Inc. v. Roanwell Corporation,* 403 F.Supp. 138 (S.D.N.Y.1975) (Conner, J.)

See also *Timely Products Corporation v. Arron,* 523 F.2d 288 (2d Cir. 1975).

■ In sum, the "signposts" of non-obviousness [*cf. Reiner v. I. Leon Co.,* 285 F.2d 501, 504 (2d Cir. 1960), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961)] include the long felt need for such a device which was not theretofore available, its fairly instant commercial success, copying by the defendants, and a new, useful and unique permutation of various prior art combined into a subject matter as a whole which was previously unobvious. In *Lyon v. Bausch & Lomb Optical Co.,* 224 F.2d 530, 535 (2d Cir. 1955), Judge Learned Hand wrote in terms apposite here:

> . . . nothing in the implementary arts had been lacking to put the advance into operation; when it appeared, it supplanted the existing practice and occupied substantially the whole field. We do not see how any combination of evidence could more completely demonstrate that, simple as it was, the change had not been "obvious . . . to a person having ordinary skill in the art"—§ 103.

When a competitor suddenly gives up his way of doing things and switches to the invention or, after poo-pooing the invention and reporting that it won't work the defendant adopts it and uses it successfully on a large scale, the evidence thereof may be more convincing than what he says. *See Lancaster Colony Corp. v. Aldon Accessories, Ltd.,* 506 F.2d 1197, 1199–1200 (2d Cir. 1974). It may be reasonably inferred from the copying that the Maclaren stroller represents a significant innovation, is a useful invention, and that a competent person skilled in the art required the device to imitate it. *See generally Systematic Tool & Machine Co. v. Walter Kidde &*

*Co., Inc.*, 390 F.Supp. 178 (U.S.D.C.E. D.Penna.1975).

### 3. *Claims Made*

▉▉▉ The problem, however, as posed by B–I–W is whether Maclaren has actually claimed in the patent itself the particular cooperation of elements and simultaneous folding which appear in the actual stroller.

Section 112 provides in pertinent part that:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Maclaren's mechanical expert agrees with B–I–W that claim 1 itself does not expressly describe the feature of simultaneous one-hand folding, but states that such folding is inherent in the structure which claim 1 sets forth. Claim 1 itself quite clearly refers to the two types of pivotal movement by the two cross frames and describes two foldable brace members which are pivotally attached to the cross frames at specified points. This recitation suggests an intricate series of interconnected pivotal movements by the various members of the structure, which movements would be simultaneous because of the nature of the interconnection of the members, in contrast to the Turner patent. Although the specification may not be utilized to expand the claims of a patent, it is fundamental that the claims of a patent are to be construed in light of the specification and that both are to be read with a view to ascertaining the invention. *E.g., United States v. Adams*, 383 U.S. 39, 48–49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). Since such simultaneous folding movement is at the least suggested by the language of claim 1, reference to the specification is appropriate in the present case. *Compare Koppers Company, Inc. v. S & S Corrugated Paper Machinery Co., Inc.*, 517 F.2d 1182 (2d Cir. 1975). Such folding is quite clearly discussed in the specification at column 4,

lines 6–19 which also refers the reader to figure 2 which shows the stroller in an intermediate state of collapse. The Court therefore concludes that this feature is indeed claimed in the patent.

As opposed to the standard of non-obviousness under § 103, the standard of novelty under §§ 101 and 102, which is also based on the prior art, is a fairly liberal one, requiring only that all the elements of the putative invention or their functional equivalents cannot be found in a single, preexisting structure or description. *E.g., Kahn v. Dynamics Corp. of America*, 508 F.2d 939, 943 (2d Cir. 1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975); *Shaw v. E. B. & A. C. Whiting Co.*, 417 F.2d 1097, 1101 (2d Cir. 1969). B–I–W concedes that the stroller is new, but contends that the collapsible support assembly which is embodied in the stroller is not novel. Regardless of whether the Maclaren invention is characterized as a stroller or as a collapsible support assembly, the Court concludes that the invention is novel within the meaning of §§ 101 and 102.

B–I–W argues that the Maclaren invention is not useful because the patent defines an inoperable structure. As indicated in the preceding discussion of disclosure, the Court concludes that the patent does define an operable structure. Beyond that, it is irrefragable that the Maclaren invention is a highly useful device.

The Court therefore concludes that claim 1 meets the combined tests of §§ 101, 102, and 103. Since the rest of the claims involved in the suit are dependent upon the assembly defined in claim 1, each defining "an assembly as claimed in claim 1" and adding a particular refinement or variation, they do not require additional discussion and are all found to be valid.

### 4. *Late Claiming*

B–I–W asserts that the second releasable means of claim 1 and the struts of claims 10 and 11 were first claimed by

amendment on February 23, 1968, more than one year after the Maclaren stroller was in public use on the basis of demonstrations to buyers at two national trade shows in January 1966, and that these claims are therefore invalid under the doctrine of late claiming.

The rule states that a public use of an invention more than one year prior to the time that the invention is specifically claimed renders the claim for the invention invalid, regardless of the fact that the invention may have been disclosed but not formally claimed in the application as originally filed less than one year after the public use. *Kahn v. Dynamics Corporation of America,* 367 F.Supp. 63, 72–73 (S.D.N.Y. 1973), *aff'd,* 508 F.2d 939, 943 (2d Cir. 1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975). *Contra, Azoplate Corp. v. Silverlith, Inc.,* 367 F.Supp. 711, 731–32 (D.Del.1973) (continuous disclosure of invention in an application filed within one year of public use is sufficient even though invention not claimed until more than one year after public use). The inquiry is twofold: (1) was there a public use of the invention claimed, and (2) were claims of substantially similar scope presented at an earlier state of the application process?

In the fall of 1965, Joseph Williams, an international inventor's representative acting on Maclaren's behalf, discussed American manufacture of the stroller and another Maclaren product with the Collier-Keyworth Company of Massachusetts. Collier-Keyworth expressed interest in the stroller and initially borrowed one and later purchased several strollers in order to study the possibility of manufacturing them.

In December 1965, Collier-Keyworth indicated to Williams that its cost estimates were favorable and that it would like to show samples of the stroller to its largest customers at the January trade shows in order to test their reactions. Williams wrote that Maclaren and his attorney fully agreed that Collier-Key-

worth "must" make a survey of the market and that the January trade shows in New York and Chicago offered the best opportunity. Maclaren had previously written to Collier-Keyworth, indicating that he was sending two more strollers with minor improvements in height for the New York show.

Robert Keyworth testified that at the New York trade show which he attended the stroller was demonstrated in a special room to between 40 and 50 of Collier-Keyworth's largest and most knowledgeable customers. Collier-Keyworth told its customers that it was neither soliciting nor accepting any orders at that time, but that it was contemplating manufacturing the stroller and wanted to know if it was salable and at what price.

After the trade shows, the strollers went back to the Collier-Keyworth factory for the continuing examination of their cost and structure. Keyworth took one of the Maclaren strollers home and used it for his child and eventually discarded it. Maclaren knew of such use and did not object, believing that Keyworth was only using the stroller on his own grounds and in confidence to satisfy himself that it was a useful article.

Negotiations between Collier-Keyworth and Maclaren were ultimately unsuccessful and no agreement for the manufacture of the stroller was ever reached between them, although Collier-Keyworth now manufactures a stroller which competes with the UMBROLLER and the stroller manufactured by Gerico under the Maclaren patent and the Bell license.

The initial question is whether the strollers sent to Collier-Keyworth for the trade shows contained the second releasable means of claim 1 and the struts of claims 10 and 11 of the patent. Maclaren could not remember whether the strollers sent to Collier-Keyworth were the same as those depicted in figure 4 of the patent, but indicated that there were very few differences in any of the models. Keyworth testified that the stroll-

ers received by his company were substantially similar to the figure 4 stroller, although the initial strollers had only four wheels. The Court finds that the strollers demonstrated at the trade show and used by Keyworth contained the features of claims 1, 10 and 11.

The next question is whether the trade shows or Keyworth's personal use of the stroller constituted a "public" use. A display of a claimed invention to a limited number of buyers in order to assess its marketability, as in this case, is not a public use. See International Silver Co. v. Pomerantz, 271 F. 2d 69, 72 (2d Cir. 1959). No purchase orders were solicited or accepted. The fact that the marketability test was initially proposed by and was conducted by Collier-Keyworth rather than Maclaren does not change that conclusion.

Similarly, a use of the invention primarily for experimental purposes is not a public use. See Shaw v. E. B. & A. C. Whiting Co., 417 F.2d 1097, 1099 n. 1 (2d Cir. 1969). In Maclaren's mind at least, the strollers were still in something of an experimental, pre-production stage, although Collier-Keyworth was apparently prepared to consider manufacturing the strollers on the basis of the models they already had without further modifications. In November 1965, Maclaren characterized the stroller sent to Collier-Keyworth as a "prototype in which improvements could obviously be made," and the two strollers sent for the January trade show in New York contained minor improvements in height.

At the same time, however, the stroller must be considered to have been in a fairly advanced stage of development. Maclaren himself apparently thought his stroller was rapidly approaching the marketable stage since he was concerned about waiting until the following year to introduce the stroller on the market. Collier-Keyworth was prepared to go forward as indicated and had not made any substantial alterations in the samples it had received. None-

theless, continuation of bona fide experimentation does not constitute public use even though the invention may prove to be complete and require no further modification. In re Yarn Processing Patent Validity Litigation, 498 F.2d 271, 277–78 (5th Cir. 1974), cert. denied, Sauquoit Fibers Co. v. Leesona Corp., 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974).

The Court finds that Keyworth's use of the stroller at home following the January trade shows was not a public use. Maclaren had recognized in November that Collier-Keyworth had not had very long to assess the commercial and production possibilities of the stroller, and by permitting Keyworth to use the stroller at home, Maclaren provided him with a practical opportunity to test its usefulness. In context, Keyworth's use and subsequent discarding of the stroller appears to be more akin to a consumer test or experimental use under Maclaren's control than a "public" use. See generally Shaw v. E. B. & A. C. Whiting Co., 417 F. 2d 1097, 1099 n. 1 (2d Cir. 1969).

Apart from the foregoing, the Court concludes that claims of substantially similar scope with respect to keeping the foldable side braces extended were in fact presented in the original application, even though they were not formally denominated as a "second releasable means." The toggle strut means of claim 2 of the original application, construed in light of the specification and drawings which were the same as those of the patent as issued, was broadly described as performing the two functions which were later broken down into the first and second releasable means. Claim 8 of the original application specifically describes a strut connecting an intermediate portion of a side brace to the bottom corner of the bottom frame. Thus there was no late claiming of the second releasable means or the struts, nor was a supplemental oath required.

**304**

INFRINGEMENT

█ Whether or not a patent has been infringed is determined by reference to the claims construed in light of the specification and drawings. *United States v. Adams*, 383 U.S. 39, 48–49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). As indicated above, the Maclaren patent was issued with 15 claims. Claim 1–3, 5–8, 10–12 and 14–15 are allegedly infringed, and claims 4, 9, and 13 are not involved in this suit at this time. It is agreed by the parties that the B–I–W stroller contains the elements defined in claims 2, 3, 5, 6, 7, 8, 12, 14, and 15. It is also agreed that the B–I–W stroller has all the elements of claim 1, on which all the other claims are dependent, except the "two-axes pivot joint" as defined in the claim.

While never expressly admitting that B–I–W copied the Maclaren stroller, counsel for B–I–W stated that the Maclaren stroller was clearly the motivation for what B–I–W did and that the Maclaren and B–I–W strollers are identical except for the pivot joint. Even at that, the only difference between the pivot joints in the Maclaren and the B–I–W strollers is that the former uses 3 pins in the pivot joint while the latter uses 4. Both strollers use two L shaped brackets. Both strollers use one pin to connect one cross frame to one L bracket and a second pin to connect the other cross frame to the other L bracket. The difference between the two strollers is that Maclaren uses the third pin to accomplish two connections—connecting the two L brackets directly to each other and then connecting them to the wheel strut at the same point—while B–I–W uses a third pin to connect one L bracket to the wheel strut and a fourth pin to connect the other L bracket to the wheel strut at a point less than one inch below the third pin without any direct interconnection of the two L brackets.

This is hardly a difference of any engineering significance. Moreover, Goodwin's August 27, 1970 letter to Maclaren quite plainly indicated B–I–W's intent to proceed with the manufacture of a model which would infringe the patent unless the patent was invalid. Thus a finding of copying of the inventor's embodiment of the patent by B–I–W is warranted and is made.

█ The standard for infringement, however, is not the embodiment of the patent, but rather the claims of the patent. Gambrell indicated that B–I–W's defense to infringement of claim 1 was based on the particular wording of claim 1 with respect to the two-axes pivot joint and that if the Court concluded that the recitation defined an operable device, claim 1 was infringed by B–I–W's stroller. As indicated above, the Court does conclude that the two axes pivot joint describes an operable device. The phrase "interpivotally attaching" in claim 1 is not limited to the one pin used by Maclaren to connect the L brackets to the wheel struts, but also reached the use of two pins to accomplish the same result. The two L brackets and four pins of the B–I–W stroller perform the same function in essentially the same way to obtain the same results as the two-axes pivot joint defined in claim 1, the specification, and the drawings, and claim 1 is therefore infringed. *See Bela Seating Company v. Poloron Products, Inc.*, 297 F.Supp. 489, 507 (N. D.Ill.1968), *aff'd*, 438 F.2d 733 (7th Cir. 1971), *cert. denied*, 403 U.S. 922, 91 S. Ct. 2228, 29 L.Ed.2d 701 (1971).

██ Judgment will be entered in favor of plaintiffs on liability for infringement of the claims in issue. Plaintiffs are entitled to an injunction restraining further infringement for the remainder of the term of the claims in issue and, if the parties cannot compromise the matter, to an accounting of damages for past infringement. The Court concludes that an award of increased damages under 35 U.S.C. § 284 is not warranted. Although infringement by defendants was intentional in the sense that they virtually copied the actual embodiment produced by Maclaren under the patent, their belief that the

patent was invalid had an arguable basis, the conclusion of the Court that the patent is valid notwithstanding.

Plaintiffs' counsel should prepare a proposed judgment and submit it to defendants' counsel for approval as to form.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a), Fed.R.Civ.P.

So ordered.